**UNITED STATES of America, Appellee,**

v.

**David THAI, Lan Ngoc Tran, Minh Do, Jimmy Nguyen, Hoang Huy Ngo, Quang Van Nguyen, and Lv Hong, a/k/a "L.V. Hong", Defendants–Appellants.**

Nos. 545, 541, 532, 550, 551, 690, 689, Dockets 92–1641(L), 92–1657, 92–1658, 92–1659, 92–1660, 92–1661, 92–1662, 92–1700.

United States Court of Appeals,
Second Circuit.

Argued Feb. 3, 1994.

Decided July 11, 1994.

Patricia Pileggi and Alan Vinegrad, Asst. U.S. Attys., Brooklyn, NY (Zachary W. Carter, U.S. Atty. for the E.D. of N.Y., Peter A. Norling, Asst. U.S. Atty., Brooklyn, NY, on the brief), for appellee.

Jeremy Gutman, New York City (Robert Rosenthal, on the brief), for defendant-appellant David Thai.

Bennett M. Epstein, New York City, for defendant-appellant Lan Ngoc Tran.

John M. Apicella, Brooklyn, NY, for defendant-appellant Minh Do.

Philip Katowitz, New York City, for defendant-appellant Jimmy Nguyen.

Christine E. Yaris, New York City, for defendant-appellant Hoang Huy Ngo.

Michael F. Grossman, New York City, for defendant-appellant Quang Van Nguyen.

David G. Secular, New York City, for defendant-appellant L.V. Hong.

Before: OAKES, KEARSE, and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants David Thai, Lan Ngoc Tran ("Lan Tran"), Minh Do, Jimmy Nguyen ("Jimmy"), Quang Van Nguyen ("Quang"), Hoang Huy Ngo ("Hoang Ngo"), and LV Hong appeal from judgments entered in the United States District Court for the Eastern District of New York following a jury trial before Carol Bagley Amon, *Judge,* convicting them of a host of crimes involving murder, robbery, and extortion, in connection with their participation in the activities of a street gang. All of the appellants were convicted of participating and conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d) (1988). In addition, Thai was convicted on 14 other counts: one count of conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (1988), one count of conspiracy to commit assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(6) (1988), eight counts of conspiracy to obstruct commerce by robbery or extortion, in violation of 18 U.S.C. § 1951 (1988) (the "Hobbs Act"), two counts of possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d) (1988), and two counts of possession of a firearm without serial numbers, in violation of 26 U.S.C. § 5861(i) (1988). Lan Tran was convicted on seven additional counts: one count of conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5), and six counts of conspiracy to obstruct commerce by robbery or extortion, in violation of the Hobbs Act. Minh Do, Jimmy, Hoang Ngo, Quang, and LV Hong were each convicted on one additional count of conspiracy to obstruct commerce by robbery or extortion, in violation of the Hobbs Act.

Thai was sentenced principally to two concurrent terms of life imprisonment, plus one term of twenty years, two terms of ten years, and one term of three years, all to be served concurrently with his life terms; the prison terms were to be followed by three concurrent three-year terms of supervised release, plus one one-year supervised-release term to be served concurrently with the three-year supervised-release terms. Thai was also ordered to pay $413,285 in restitution. Lan Tran was sentenced principally to two concurrent terms of life imprisonment, plus one term of twenty years and one term of ten years to be served concurrently with his life terms, to be followed by two concurrent three-year terms of supervised release. Jimmy was sentenced principally to two concurrent terms of life imprisonment, plus one term of twenty years to be served concurrently with his life terms, to be followed by one three-year term of supervised release. The remaining defendants were sentenced principally to the following terms of imprisonment, each to be followed by three concurrent three-year terms of supervised release: Minh Do—three concurrent terms of 130 months; Hoang Ngo—three concurrent terms of 188 months; Quang—three concurrent terms of 168 months; and LV Hong—three concurrent terms of 121 months.

On appeal, defendants make numerous challenges to their convictions, including challenges to (a) the use of an anonymous jury, (b) the conduct of the prosecutors, (c) various evidentiary rulings, and (d) the sufficiency of the evidence. They also challenge several aspects of sentencing. For the reasons below, we reverse Thai's conviction for conspiracy to assault in violation of § 1959 and remand for recalculation of his sentence in light of that reversal. In all other respects, we affirm.

## I. BACKGROUND

The present appeals arise out of the prosecution of the seven appellants and others in connection with their participation in the affairs of a gang known as Born To Kill ("BTK") or the "Canal Boys." At trial, the government presented voluminous evidence, including the testimony of more than 80 witnesses; hundreds of exhibits, including tapes and transcripts of approximately 30 recorded conversations among members of BTK; and physical evidence including guns, ammunition, and homemade bombs. Among the gov-

ernment's witnesses were some two dozen victims of BTK crimes and four former BTK members, Tinh Ngo, Khang Thanh Vu ("Kenny Vu"), Thanh Tran ("Eddie Tran"), and Nigel Jagmohan. Taken in the light most favorable to the government, the evidence revealed the following.

## A. *Gang Structure and Operation*

BTK was an organized street gang that committed violent crimes, principally robbery and extortion. Thai was BTK's leader from 1988 until his arrest in August 1991. He oversaw BTK's operations, planned many of its crimes, and collected the proceeds of its activities. Lan Tran and LV Hong were Thai's principal assistants. Lan Tran helped supervise the other gang members and often participated in the gang's crimes. LV Hong was responsible for internal discipline and for overseeing most of BTK's extortion activities.

The membership of BTK consisted almost entirely of young Vietnamese males. They lived in safehouses in groups of 5–10, with their living expenses paid by Thai and other gang leaders. Discipline was strict, and gang members who disobeyed orders or who were suspected of cooperating with the police or of keeping the proceeds of robberies for themselves, instead of turning them over to Thai, suffered violent retribution. Thai and LV Hong often participated directly in these disciplinary actions.

The geographic center of BTK operations was New York City's Chinatown. Many of the robberies and extortions took place on or near Canal Street in that area, though the gang had cells outside of New York as well. Virtually all of the gang's robbery and extortion targets were Asian, largely because of the gang's belief that such victims "don't know much about the law and they don't complain to the police." (Trial Transcript ("Tr.") 521.) The robberies were usually planned by Thai, who typically selected the participants and the victims, planned the timing and manner of the robbery, and provided weapons.

The extortions, concentrated in the Canal Street area, consisted in part of BTK members' collecting an average of $20 or more per week from each of the Asian store own-ers and sidewalk merchants on Canal Street. From a small number of other merchants in the area, they would also collect up to several hundred dollars at a time. Typically two or more gang members would enter a store and demand money from the owner. One of the gang members would record the store address and the amount received. LV Hong oversaw the operation, and at the end of the day, the money that had been collected was turned over to him. LV Hong was responsible for dealing with recalcitrant merchants. Those who did not comply with BTK's demands were beaten or robbed.

## B. *Specific Crimes*

The 21–count indictment charged all of the appellants, and others, with racketeering and RICO conspiracy, and charged each of the appellants with one or more other offenses. Some of the events underlying these charges are summarized below.

### 1. *The W.C. Produce Robbery and the Killing of Cuong Pham*

In August 1990, Jimmy and several other young Vietnamese males entered W.C. Produce, a Chinatown vegetable wholesaler, brandishing guns and demanding money. They searched the employees and the premises; they bound several of the employees with telephone wire, hit two employees in the head with guns, and shot one employee behind the ear.

When Jimmy demanded more money and the owner of the store responded that there was none, Jimmy said, "you looked at me, now I'm going to shoot you." (Tr. 2187.) Jimmy then fired but narrowly missed the owner. Instead, his bullet struck and killed fellow gang member Cuong Pham, who had been standing near the owner. The robbers fled the premises, taking with them approximately $3,000 in cash, as well as jewelry taken from the individuals.

### 2. *The Bangkok Health Spa Robbery in Connecticut*

In the fall of 1990, one "Fat Lam," a BTK member in Bridgeport, Connecticut, advised Thai that the Bangkok Health Spa, a mas-

sage parlor in Bridgeport, would make a good robbery target. Thai sent Lan Tran, Kenny Vu, codefendant Tan Lai, and one other gang member to execute the robbery. Thai said Lan Tran should enter the parlor first, followed shortly by the other three. Thai gave each of them guns.

On the evening of November 3, 1990, Chin Suk Ruth was working as an employee of the parlor when Lan Tran rang the bell and entered the lobby. After a brief conversation, Lan Tran pulled out a gun and forced Ruth to open the door so that the other gang members could enter. He forced Ruth and most of the other employees and customers to lie on the floor while the robbers ransacked the parlor searching for money and other valuables. The robbers questioned Ruth at gunpoint about where the valuables were kept, slapped her, held a knife to her face, and kicked one of her companions. The robbers took, *inter alia*, money and a VCR from the parlor, and took a wallet, jewelry, and a leather jacket from Ruth. They cut the telephone wires and told Ruth they would kill her if she called the police. As they left, Lan Tran paused to point his gun at Ruth.

The robbers returned to the gang's house in Bridgeport, where they were met by Thai.

### 3. The Vientiane Restaurant Robbery in Connecticut

A week or so later, Thai decided that BTK should rob the Vientiane Restaurant, a Laotian restaurant in Bridgeport also identified by Fat Lam as a potential target. Designating Kenny Vu, Lan Tran, and a third member of the gang to execute the robbery, Thai again told Lan Tran to enter first, with the other two gang members to follow.

Accordingly, on November 11, Lan Tran entered the Vientiane Restaurant, went into the kitchen, and forced the five employees into the back room, where he told them to sit on the floor and keep their hands over their heads. Kenny Vu and the third gang member entered the restaurant, and the robbers took money from the cash register and jewelry from some of the individuals. The robbers then pulled the telephones from the wall and left the restaurant, with Lan Tran paus-

ing to point and cock his gun at the owner before leaving.

The robbers then went to the Bridgeport house where Thai and other gang members were waiting. They turned the proceeds of the robbery, approximately $5,000, over to Thai.

### 4. The San Wa Fine Jewelry Store Robbery in Georgia and the Attempted Murder of Odum Lim

In late November 1990, Thai told Tinh Ngo the gang was going to commit a robbery "far away," and he sent Tinh Ngo, Kenny Vu, Tan Lai, codefendant Bao Hung Tran ("Nicky"), and other gang members to Georgia. Thai, Hoang Ngo, and others also went to Georgia, and they met with the first group in Gainesville. Thai, Hoang Ngo, Lan Tran, and others stayed at the home of Hoang Ngo's uncle (the "Gainesville house"), while the first group stayed in a motel. Hoang Ngo drove Thai and other gang members from Gainesville to the San Wa Fine Jewelry store in nearby Doraville, Georgia. Thai, after checking inside, said the store would be "easy to hit." (Tr. 591.) Hoang Ngo went to a pawn shop and purchased four guns.

Thai and several other BTK members, including Lan Tran, Quang, and Hoang Ngo, planned the robbery. As eventually executed, 10 members of the gang drove in three cars to a parking lot several blocks from the store; Thai then broke his necklace and told Nicky to enter the store pretending to want to get it fixed. Eight gang members then proceeded in two of the cars to the San Wa Fine Jewelry store. When they reached the store, the only people there were owners Odum Lim and his wife Kim Lee Lim, with their two young daughters. Nicky entered and approached Kim Lim, asking her to repair the broken necklace. He then jumped the counter, grabbed her by the neck, and forced her and her daughters at gunpoint to the back of the store. Nicky placed Kim Lim in handcuffs and told her that if she made a loud noise, he would kill her and her daughters. Lan Tran took money from the safe, Tinh Ngo broke the showcases and took

jewelry, and Kenny Vu guarded the front door to ensure that no one interfered.

In the meantime, Tan Lai had pulled out a knife and grabbed Odum Lim, while another gang member pointed a gun at Odum Lim's head. Odum Lim tried to get possession of the gun, which fired into the ceiling. During the struggle, Tan Lai stabbed Odum Lim repeatedly. Finally, Tan Lai called to Lan Tran for help, and Lan Tran came over and shot Odum Lim in the head. The gang members gathered up the jewelry and rushed out to the waiting cars, inadvertently leaving Nicky behind, and drove back to the parking lot. There they met Thai and Quang and returned to the Gainesville house. Nicky eventually returned to the house in a taxi.

All told, the gang had taken more than $53,000 in cash and jewelry, which they turned over to Thai. Once all of the gang members had returned to the house, Thai gave each $400–500 and told them to return immediately to New York. He said he would try to sell the jewelry and give them more money later.

Odum Lim was hospitalized for nearly a month but survived the attack.

### 5. The Asian Market Robbery in Tennessee

A few days before the San Wa Fine Jewelry robbery, Quang arrived at the Gainesville house and suggested robbing a Vietnamese jewelry store that was two hours away. Shortly thereafter, Jimmy retrieved a gun from the closet and he, Quang, and another gang member left the house.

On November 22, 1990, Ms. Quang Nguyen (not related to defendant Quang Van Nguyen or defendant Jimmy Nguyen) was at work in her shop, the Asian Market, a food and jewelry store located in Chattanooga, Tennessee, some 120 miles from Gainesville, Georgia. Jimmy and another gang member entered, walked around the store, purchased a few items, and then left. As Ms. Nguyen prepared to leave for the evening and placed the store's jewelry and cash in a bag, Jimmy knocked at the door and asked for directions. When Ms. Nguyen opened the door to answer, Jimmy forced her back into the store at gunpoint and told her that if she made any noise he would kill her. Another gang member entered the store and put a gun to Ms. Nguyen's back, and the robbers took her bag, which contained approximately $4,000 in cash and $62,000 worth of jewelry.

Forcing Ms. Nguyen to the back of the store, Jimmy bound her with plastic tape and pistol-whipped her. Seating her on a bag of rice, the other gang member took a knife and repeatedly stabbed the bag on either side of Ms. Nguyen until she fainted. The robbers then returned to the Gainesville house, where they gave the proceeds of the robbery to Thai. (Tr. 2643.)

### 6. The Golden Star Jewelry Store Robbery

In early 1991, Thai decided that the gang should rob Golden Star Jewelry, a Vietnamese-owned store located at 302 Canal Street. He selected several gang members, including Jimmy, to commit the robbery. On January 21, 1991, those designated were driven to the jewelry store in two cars. Armed, several of them entered and ordered the employees and the owner, Sen Van Ta, to lie on the floor and keep their faces down. The robbers proceeded to take jewelry from the store and took money and jewelry from the employees. Several of the employees were beaten.

As the robbers left, a police officer noticed two Asian males run from the direction of the jewelry store and enter a blue Cadillac. He then saw two other Asian males run from the same direction, throw a bag into the back seat of the Cadillac, and jump into the car, which had already begun to move. Several officers pursued the Cadillac through the streets of Chinatown. During the chase, the occupants of the Cadillac opened the doors and threw guns and ammunition into the street. The Cadillac eventually went through a red light and crashed into an oncoming vehicle, coming to a stop shortly thereafter. The driver of the car was Hoang Ngo; he and three other gang members were arrested, and a small quantity of jewelry from Golden Star Jewelry was recovered.

That night, Jimmy, who had not been in the Cadillac, met Thai and gave him a bag of

jewelry from the robbery. The four gang members who had been arrested eventually pleaded guilty to robbery charges in state court.

### 7. The Murder of Sen Van Ta

After the robbery of Golden Star Jewelry, Sen Van Ta, the owner, identified several of the robbers in a line-up. BTK then began a series of attempts to prevent Ta from testifying. First, Thai spoke with Ta and one of the employees; Thai later told BTK members that he had convinced these witnesses not to testify. A few weeks later, Ta received an anonymous letter containing broken glass and a newspaper article about the robbery. On another occasion, Thai approached Ta as he was opening the store and told him to go to court and say that the four arrested BTK members were not the robbers.

In February 1991, BTK members collecting money from the merchants on Canal Street demanded money at Golden Star Jewelry. Ta refused, saying, "our shop was just robbed, how would we have money to give you." (Tr. 4644.) LV Hong, informed of Ta's refusal, returned to the store with several other gang members and berated Ta, who persisted in his refusal to pay. Ta promptly reported these visits to the police, and he later identified LV Hong and another gang member as two of the would-be extortionists. LV Hong and the other gang member were arrested; they were later released.

After his release, LV Hong related these events to Thai, and Thai said he wanted to "solve the problem at 302 Canal Street, the one who called the policemen." (Tr. 2348.) Lan Tran offered to take care of Sen Van Ta.

On the evening of March 10, 1991, Lan Tran and Kenny Vu hired a car and were driven to Chinatown. Lan Tran got out, telling Kenny Vu to wait, and walked to a shop just north of Canal Street, where Ta was helping his wife close up. Ta's 12-year-old nephew Vinh Tran was also present. Lan Tran walked into the store, pulled out a gun, and fatally shot Ta in the head.

### 8. The E5 Communications Robbery

E5 Communications, a Chinese-owned beeper and cellular telephone store north of Canal Street, was a main supplier of equipment and beeper service for BTK members. In March 1991, E5 refused to give free beepers to certain BTK members, including LV Hong. Kenny Vu later informed one of the owners of E5 that LV Hong was a "big brother" on Canal Street and that E5 should give him a free beeper and telephone. When E5 refused, LV Hong suggested to Thai that they rob the store. Thai agreed and instructed LV Hong, Jimmy, and two others to commit the robbery.

On the evening of March 25, 1991, Jimmy and one of the other gang members entered the store. They pulled out guns and told the store employees to get on the floor. The robbers kicked one employee and forced another to open the cash register; they fled with a telephone, approximately $2,000 in cash, and jewelry taken from the employees. After the robbery, Kenny Vu informed one of E5's owners that the store had been robbed because of E5's refusal to provide free beepers to BTK members.

### 9. The E5 Communications Extortions

Before and after the robbery of E5 Communications, BTK also used intimidation and threats to ensure free or discounted beeper service. Gang members would enter the store in groups, announce that they were "Canal Boys" or "from Canal Street," and demand discounted beeper service or free accessories. If the owners balked, the gang would become disruptive, causing other customers to leave, and would refuse to stop until the owners gave them what they wanted. In addition, for more than a year, E5 received calls once or twice a month from persons identifying themselves as BTK members and threatening that if E5 failed to give the gang beeper service, BTK would blow up the store. Eventually, E5 agreed to give BTK members a 33% discount on their beeper service.

At times the BTK members refused to pay even this discounted price. In early 1991, prior to the March 1991 robbery described in Part I.B.8 above, E5 turned off the beepers

of two gang members who had not paid their bills. Minh Do then went to E5 and demanded that the beepers be restored to service. When E5 refused, Minh Do returned with LV Hong and Lan Tran, said that the beepers belonged to the two men, who were his "dai los," or "leaders," and insisted that the beepers be reactivated. E5, after attempting unsuccessfully to collect the unpaid bills, reactivated the beepers. Before leaving the store, Lan Tran warned one of the owners never to turn the beepers off again. In July 1991, E5 again turned off LV Hong's beeper service. LV Hong and Lan Tran paid another personal visit to the store and again successfully demanded restoration of service without payment of bills.

### 10. *The Assault on Nigel Jagmohan*

On April 15, 1991, Nigel Jagmohan and three other gang members held up a jewelry store on Canal Street but crashed their getaway car into a street pole. Though the driver of the car was immobilized, Jagmohan and the other gang members escaped. Jagmohan told his cohorts that while he was leaving the scene of the crash, he had thrown away a bag of jewelry acquired in the robbery.

The following day, LV Hong began to inquire about the proceeds of the robbery. That evening, LV Hong and Thai sought out Jagmohan at a BTK safehouse in Brooklyn. Rejecting Jagmohan's repeated assertions that he had thrown the bag of jewelry away, LV Hong and Thai attempted to beat him into turning it over. LV Hong repeatedly hit him over the head with a portable radio and a cutting board, while Thai kicked him. After some 30 minutes, LV Hong and Thai apparently concluded that Jagmohan did not know where the jewelry was, and the beating ceased. By that time, Jagmohan was bleeding profusely and blood was splattered all over the room. LV Hong ordered Jagmohan to leave the safehouse; Jagmohan complied and had no further contact with BTK.

### 11. *The Conspiracy To Rob the Ming Jewelry Store in Rochester*

In early May 1991, Thai and Lan Tran told Tinh Ngo that Lan Tran, Minh Do, Tinh Ngo, and Tam Thanh Do ("Son") would travel several hours away to commit a robbery. A few days later, they drove to Rochester and met Thai at the hotel in which he was staying. Thai told them he wanted the four of them to rob the Ming Jewelry Store near Thai's hotel. Thai instructed that if store employees resisted during the robbery, they should be shot in the head.

By this time, however, Tinh Ngo had become a government informant, and when the BTK members set out for the jewelry store the next morning, forewarned law enforcement authorities stopped them. The gang members were questioned; their cars were searched, and their weapons and ammunition were found. However, to protect Tinh Ngo, the police released all of them, indicating that they had been stopped because they met the descriptions of drug traffickers.

### 12. *The Conspiracy To Bomb the Pho Bang Restaurant*

In early August 1991, Thai told Tinh Ngo that Thai had been offered $10,000 to set off a bomb at the Pho Bang Restaurant in Chinatown. Thai told Tinh Ngo that he had previously instructed Minh Do to bomb the Pho Bang but that Minh Do had bombed the wrong restaurant; Thai learned of the error from the person who had hired him for the job. Thai then gave Tinh Ngo a homemade bomb and instructed him how to detonate it. He told Tinh Ngo to find a new gang member to do the job. Tinh Ngo persuaded a newly-enlisted gang member, "Tom," to do the bombing; another gang member, "Hai," offered to act as a lookout. However, Tinh Ngo spoke to the police, and when Tom and Hai approached the Pho Bang Restaurant that night, the police arrested them and took possession of the bomb.

### 13. *The Conspiracy To Rob Sun Moon Trading*

Also in early August, Thai and Lan Tran planned to rob Sun Moon Trading, a watch company in Manhattan. Lan Tran explained to Tinh Ngo that some "Italians" were going to gain entry to the store by pretending to be federal agents, and that BTK members would then rob the company. On the morn-

ing planned for this robbery, Thai drove Lan Tran and LV Hong to Manhattan. After dropping them off, Thai picked up Tinh Ngo and Eddie Tran, who were to load the watches into a van and drive the van to Long Island. The robbery plan was abandoned, however, when their Italian cohorts spotted police surveillance near Sun Moon Trading.

## C. The Present Prosecution

In August 1991, many of BTK's leaders and members were arrested. In a 21–count superseding indictment, the government charged 12 defendants, including the seven appellants, Tan Lai, Nicky, and Son, with conducting, and conspiring to conduct, the affairs of BTK through a pattern of racketeering activity (counts 1 and 2 (the "RICO counts")). In addition, Thai and Lan Tran were charged with conspiring to murder Sen Van Ta for the purpose of maintaining or increasing position in the BTK enterprise, in violation of 18 U.S.C. § 1959; and Thai was charged with a similar violation of § 1959 in connection with the conspiracy to bomb the Pho Bang Restaurant. Thai was also charged with nine counts of Hobbs Act conspiracy, based principally on the BTK robberies and planned robberies described above, and with several counts of firearms violations. Lan Tran, in addition to the RICO and § 1959 counts, was charged with seven counts of Hobbs Act conspiracy in connection with the two robberies in Connecticut, the San Wa Fine Jewelry robbery in Georgia, the conspiracy to rob the Ming Jewelry Store in Rochester, the conspiracy to rob Sun Moon Trading, and two other robbery conspiracies not described above. One count of Hobbs Act conspiracy was alleged against each of the other appellants in connection with their respective participations in the above events, to wit: against Quang and Hoang Ngo for the San Wa Fine Jewelry robbery in Georgia, against Jimmy for the E5 robbery, against Minh Do for the conspiracy to rob the Ming Jewelry Store in Rochester, and against LV Hong for the conspiracy to rob the Sun Moon Trading watch company.

The seven appellants were tried together before an anonymous jury, along with an eighth defendant, David Nguyen, who was acquitted of the four counts against him, to wit, the RICO counts and two Hobbs Act counts. Thai and Lan Tran were acquitted of one count of Hobbs Act conspiracy to commit robbery of a Long Island leather store; they were convicted on all of the other counts described above. Minh Do, Jimmy, Hoang Ngo, Quang, and LV Hong were convicted on all of the counts against them.

Appellants were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

On appeal, defendants make numerous challenges to their convictions. They contend principally that various aspects of the jury proceedings denied them due process, that the court erred in admitting hearsay testimony as to statements by Sen Van Ta, and that the court should have excluded evidence of so-called "other crimes." Other contentions include Minh Do's claims of prosecutorial misconduct, principally with respect to the nonproduction or delayed production of evidence; challenges by Lan Tran and Jimmy to various identifications of them by robbery victims; challenges by Quang to both the sufficiency of the evidence to support his conviction on the RICO counts and the court's jury charge with respect to those counts; challenges by Thai to the sufficiency of the evidence to support his § 1959 conviction in connection with the Pho Bang bombing conspiracy; and challenges to sentencing. Only Thai's sufficiency challenge requires reversal.

### A. Contentions With Respect to the Jury

Defendants make several arguments focusing on the jury. They challenge the court's empaneling of an anonymous jury. In addition, they contend that the jury engaged in premature deliberations and that its verdict was the result of confusion.

#### 1. Use of an Anonymous Jury

■ The law is clear in this Circuit that "when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights." *United*

*States v. Vario,* 943 F.2d 236, 239 (2d Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). Anonymity may be warranted when the jury needs protection, as when the government has demonstrated a defendant's "willingness ... to tamper with the judicial process," *id.* at 240; *see also United States v. Amuso,* 21 F.3d 1251, 1264 (2d Cir.1994); *United States v. Thomas,* 757 F.2d 1359, 1365 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985); *United States v. Ferguson,* 758 F.2d 843, 854 (2d Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985), or when there has been extensive pretrial publicity in cases involving allegations of violent conduct, *see, e.g., United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992). If an anonymous jury is warranted, a defendant's fundamental rights must be protected "by the court's conduct of a *voir dire* designed to uncover bias as to issues in the cases and as to the defendant," and by "t[aking] care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures." *Id.* (internal quotes omitted). If there is evidence to support the district court's finding of reason to believe the jury needs protection, and if the court has taken reasonable precautions to minimize any prejudicial effects on the defendant and to ensure protection of his fundamental rights, the decision to empanel an anonymous jury is reviewed only for abuse of discretion. *Id.*

■ In the present case, the government moved for an anonymous jury based in large part on evidence of defendants' acts of intimidation toward their crime victims, their attempts to kill certain of those victims, and the murder of Sen Van Ta because of his refusal to retreat from his complaints to the police. The government also maintained that jurors whose identities were disclosed would be at risk because BTK had at least 100 members, many of whom were not in custody.

The district court concluded that the grounds for empaneling an anonymous jury were "compelling." Memorandum and Order Dated January 6, 1992, at 5. It found that the government had shown that "at least two of the defendants on trial sought directly to interfere with the judicial process by threatening and ultimately killing a civilian witness in an effort to subvert prosecution of a pending robbery case against Born to Kill members," and this in itself was "a powerful reason to select an anonymous jury." *Id.* at 6. The court also found that the case had attracted and would likely continue to attract extensive media coverage, *id.* at 6–7, and that because of the violent nature of the crimes and defendants' extensive criminal history, a juror "would have a more than reasonable basis to fear for his or her safety," *id.* at 5–6. The court concluded for all of these reasons that an anonymous jury was warranted.

In order to protect defendants' interests in jury selection, the court fashioned, with the input of counsel, a 68–question juror questionnaire designed to elicit pertinent information as to possible bias. The questionnaire made extensive inquiries into the jurors' personal backgrounds; it explored possible bias resulting from prior involvement with the legal system or with any of the individuals involved in the case; and it examined other potential barriers to the rendering of a fair and impartial verdict. In order to provide a nonprejudicial reason for maintaining anonymity, the introduction to the questionnaire stated, with the approval of the parties, that "[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in Federal Court. Anonymity will ward off curiosity that might infringe on a juror's privacy...."

The record amply supported the district court's concern as to efforts by defendants to subvert the judicial process through intimidation and murder; and the court's questionnaire properly protected defendants' interests both in the selection of unbiased jurors and in the proffer of a nonprejudicial reason for the preservation of juror anonymity. We find no abuse of discretion in the use of an anonymous jury in the present case.

### 2. *Premature Jury Deliberations*

■ Defendants also contend that they were deprived of a fair trial because, notwithstanding the court's instructions at the com-

mencement of trial that the jury was "not [to] discuss the case among yourselves or with anyone else during any recess" (Tr. 10), the jury on three occasions engaged in premature deliberations. Assuming that the record supports this characterization, we nonetheless find no basis for reversal.

As to the first incident, the record indicates that early in the trial, after the government's opening statement and the opening statements of several of the defendants, the jury sent a note to the judge that stated in relevant part,

> Your Honor, a question came up in the jury room yesterday, that I believe could be resolved by hiring a non-partial translator/interpreter through the jury panel. . . . I suggest a jury-hired translator to positively eliminate the chance of any questionable evaluation.

(Tr. 87.) Defense counsel immediately expressed concern about premature deliberations, and the court reminded the jurors "not to discuss the case, even among yourselves, until after the trial is over and you receive the—heard all the evidence, the summations, the instructions on the law, and are told to deliberate." (Tr. 87–88.) The court emphasized that this prohibition was necessary to ensure that the jury "keep an open mind until you have heard everything, and it would interfere with that process to be discussing things as you went along." (*Id.* 88.) No defendant moved for a mistrial as a result of this incident or sought to have the court conduct any inquiry; no defendant objected to the court's handling of the matter.

The second incident occurred during the testimony of Tinh Ngo, one of the government's early witnesses, when the jury sent the court a note stating that "the jury requests some sort of reidentification of the defendants with their nicknames and real names. We're getting confused by the testimony of the witness." (Tr. 689.) In conference with counsel, the court stated that the jury's concern seemed valid; the same concern was promptly echoed by various defense counsel. Assistant United States Attorney ("AUSA") Alan Vinegrad was urged to have the government's witnesses make clear in each instance which defendant was being de-

scribed. Accordingly, the court advised the jury that the confusion with respect to the defendants' names and nicknames would "probably be sorted out." (Tr. 693.) In addition, although no defendant had voiced this concern with respect to the second jury note, the court again emphasized that the jury should not discuss the case at all until after all the testimony was in, the summations had been made, and the court had instructed the jury on the law. A day or so later, the court received yet another note from the jury, requesting clarification but, reassuring the court that there had been no further premature discussions. The note stated:

> I am requesting clarification of the current testimony.
>
> . . . .
>
> The silence in the jury room after your last admonition was ample indication that everyone is very much aware of the importance of carrying out the responsibilities in a proper and correct manner as you have outlined these procedures.
>
> This is however a very complicated and confusing group of names and I would like to be sure who is being spoken about.

(Tr. 851.) Upon receiving the note, the court told the attorneys "you will be happy to know they are following the admonition not to discuss the case." (*Id.*)

The third incident relied on by defendants occurred during the cross-examination of Tinh Ngo. The court reported that two of the jurors had expressed to the courtroom deputy "[t]heir concern with their inability to get along with [another juror]. As I understand they have expressed problems with his general demeanor and attitude toward them. I suppose the word obnoxious was used." (Tr. 1739.) The court further noted that the jurors mentioned "an obnoxious attitude, use of bad language, derogatory remarks about participants in the proceeding, but I suppose there is not a need to do anything. . . . There is not a need to do anything until we see something further about it." (Tr. 1740.) No defendant moved for a mistrial or urged the court to take any action.

 The handling of allegations of juror misconduct is entrusted to the sound discretion of the trial court. *See, e.g., United States v. Carmona*, 858 F.2d 66, 69 (2d Cir. 1988) (per curiam); *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985); *United States v. Hockridge*, 573 F.2d 752, 756 (2d Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 85, 86, 58 L.Ed.2d 112 (1978). The court has broad flexibility in such matters, especially "when the alleged prejudice results from statements made by the jurors themselves, and not from media publicity or other outside influences." *Grooms v. Wainwright*, 610 F.2d 344, 347 (5th Cir.), *cert. denied*, 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980). In many instances, the court's reiteration of its cautionary instructions to the jury is all that is necessary. *See, e.g., United States v. Panebianco*, 543 F.2d 447, 457 (2d Cir.1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 1129, 51 L.Ed.2d 553 (1977). We are particularly loath to second-guess the actions of the district court when the defendant has failed to object at trial, lest the defendant be permitted to "wait to hear the verdict before contesting the impartiality of the jury and then attack the court's refusal to investigate his allegation." *United States v. Edwards*, 696 F.2d 1277, 1282 (11th Cir.) (per curiam), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983).

The district court's handling of the juror conduct in this case was entirely proper. While the first note, and probably the second, suggest that there had been discussions of the case in the jury room, there was no indication that the discussions concerned anything other than a difficulty in keeping track of the names. The court properly reiterated its instruction not to engage in premature deliberations. There is no evidence that any further premature deliberations occurred. Though defendants contend that the incident in which two jurors complained that a fellow juror was "obnoxious" indicates that the jurors were continuing to discuss the case, we see no such indication.

In any event, at no time did any defendant object to the court's handling of these incidents, and there is no basis for relief on appeal.

### 3. Jury Confusion

 Hoang Ngo argues that he was convicted principally because of juror confusion over names, and that this confusion denied him due process. We note that the other defendants have joined in the appellate arguments made by their codefendants to the extent applicable. Though there can be no dispute that many of the defendants had similar, or at least similar sounding, names or nicknames and that the jurors were initially apprehensive about the possibility of confusion, we find this contention to be meritless.

First, as indicated in the preceding section, the court took steps to minimize the possibility of confusion. Thus, the government was prompted to have its witnesses identify any mentioned defendant with clarity. In addition, without objection from defendants, the court allowed the government to have a defendant, when referred to by a witness, stand up, thereby giving the jurors visual confirmation as to which defendant was the subject of the testimony. All indications of jury confusion occurred early in the trial, and the record does not indicate that there was any further confusion.

Second, the suggestion that the jury remained unable to distinguish one defendant from another because of the similarity of their names or nicknames is belied by the fact that the other defendant tried with appellants, David Nguyen, was acquitted on all of the counts against him, despite the fact that (a) his last name was the same as that of two other defendants, (b) his first name was the same as that of one other defendant, and (c) his nickname, "Dat," was similar to that of another gang member, "White Dat," who was mentioned throughout the trial. Given its evident ability to sort through the evidence with respect to David Nguyen, we see no reason to conclude that the jury was unable to do the same with the other defendants.

Finally, as indicated in Part II.F. below, with one exception defendants have made no tenable challenges to the sufficiency of the evidence against them. With respect to

Hoang Ngo, the evidence was ample. For example, he was charged with two RICO predicate acts in the indictment, *i.e.,* the robberies of San Wa Fine Jewelry and Golden Star Jewelry. As to the former, Tinh Ngo testified that Hoang Ngo had helped plan the robbery; the owner of the Georgia pawn shop identified Hoang Ngo as the purchaser of four guns; and both Kenny Vu and Tinh Ngo testified that Hoang Ngo had driven one of the cars to and from the robbery. As to the Golden Star Jewelry robbery, Hoang Ngo had pleaded guilty in state court and his attorney conceded that he was guilty.

In sum, except with respect to one count against Thai, the evidence was sufficient to support defendants' convictions; we have seen in this record no indication that the jury confused any defendant with any other person.

### B. *Allegations of Prosecutorial Misconduct*

Minh Do contends that his conviction should be reversed on account of prosecutorial misconduct, consisting principally of pretrial failures to disclose evidence. While we find some of these failures troubling, we cannot conclude that any actions of the government, either singly or collectively, require reversal.

#### 1. *The Delivery of an Incomplete Book of Tape Translations*

A large part of the government's evidence consisted of conversations among defendants recorded by confidential informant Tinh Ngo. Defendants were given copies of these tapes well in advance of trial. Just prior to trial, the government gave defense counsel a transcript book that purported to contain final English translations of all of the tapes.

In her opening statement, Minh Do's counsel addressed the matter of the tapes, telling the jury

> you are going to hear tapes. You are going to see videotapes. You are going to see pictures of [Minh Do] walking down Canal Street, and you are going to see him at work and using the sort of talk that you might expect and your common sense will tell you that a 22–year–old Vietnamese

man in his situation might use to survive in a world that is strange and foreign.

(Tr. 92.) During Tinh Ngo's testimony as to conversations he had had with Minh Do concerning the latter's participation in a robbery, the government played one tape on which Minh Do stated, *inter alia,* "some of my 'Boys' thought that they could rob the gold store, but then the alarm went off." (Tape of Conversation of June 29, 1991, 12:30 p.m., at 2.) This conversation, however, was not in the book of translations given to Minh Do's counsel, and she immediately moved for a mistrial. She argued that Minh Do was prejudiced because this conversation was inconsistent with her opening statement in which she had asserted that Minh Do's recorded conversations were consistent with what one would expect to hear from an innocent person unfamiliar with America.

The district court concluded that, pursuant to Fed.R.Crim.P. 16(a), the final translations of the tapes should have been turned over to the defense prior to opening statements. However, the court concluded that Minh Do had suffered no prejudice as a result of the government's delay, and it offered to allow his counsel more time to prepare for cross-examination. We see no basis for reversal.

Under Fed.R.Crim.P. 16(a), the government is required to turn over to the defendant on request "any relevant written or recorded statements made by the defendant ... within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government." Fed.R.Crim.P. 16(a)(1)(A). The trial court has broad discretion to fashion a remedy for the government's violation of the Rule. *See United States v. Williams,* 902 F.2d 675, 677 (8th Cir.1990). The district court's admission of evidence following a violation of Rule 16(a) is not an abuse of discretion requiring a new trial unless the violation caused the defendant substantial prejudice. *See, e.g., United States v. Matthews,* 20 F.3d 538, 548, 553 (2d Cir.1994); *United States v. Stevens,* 985 F.2d 1175, 1181 (2d Cir.1993).

For several reasons, we are unable to conclude that Minh Do's nonreceipt of the translation of the above conversation prior to trial resulted in prejudice to him. First, Minh Do had possession of copies of the tapes themselves prior to trial and had had a translator listen to them. Thus, he knew or should have known that this conversation was recorded. Further, to the extent that he was "surprised," he could have taken advantage of the district court's offer to allow counsel more time to prepare for cross-examination.

Finally, there were several other taped conversations, the translations of which were indisputably in the possession of Minh Do's counsel prior to her opening statement, and those other conversations squarely contradicted her assertion that the tapes would show Minh Do only as an innocent feeling his way in a new land. For example, on one tape, Minh Do stated, *inter alia,* "Tomorrow we are going to rob"; "Don't plan anymore"; "Tomorrow if the robbery is successful, I don't know what is next"; "Probably it will be satisfying when we count the money." (Tape of Conversation of May 10, 1991, 9:00 p.m., at 3–4.) On another tape, Minh Do, accompanied by fellow gang member Anh Loc, was recorded extorting money from a shop owner as follows:

> Minh [Do]: It's been a long time since I talked to you, please give me some money.
>
> Owner: Ok, later in the afternoon please Anh Loc. Since this morning I have not been able to sell.
>
> Loc: Ok in the afternoon.
>
> . . . .
>
> Minh [Do]: Fuck. If he doesn't give then break his stuff.

(Tape of Conversation of June 29, 1991, 12:30 p.m., at 19.) Thus, Minh Do's opening statement was contradicted even by tapes whose translations he had received.

We conclude that there was no prejudice and that the district court's decision to admit the evidence and deny Minh Do's motion for a mistrial was not an abuse of discretion.

### 2. The Tape of Tinh Ngo's Initial Police Interview

██ Pursuant to the Jencks Act, 18 U.S.C. § 3500 (1988), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defense requested that the government produce all statements made by confidential informant Tinh Ngo. The government assured the court that all requests for such "3500 material" had been complied with. No tape of Tinh Ngo's initial meeting with Detective William Oldham of the New York City Police Department was included. However, during the cross-examination of Tinh Ngo by Thai's attorney, Tinh Ngo stated that during his first interview with Oldham, there had been a tape recorder on the table. Defendants promptly moved for a mistrial.

When questioned by the court, AUSA Vinegrad stated that it was his understanding that no tape recording had been made. He said that when Tinh Ngo testified that a tape recorder had been present, Vinegrad "checked that with the individual involved." (Tr. 1297.) Oldham, who was present at counsel table, said nothing to contradict or correct Vinegrad's representations.

On the following day, however, having investigated the matter further, Vinegrad informed the court that he had been in error, and that, unbeknownst to him, the interview had in fact been recorded. Copies of the tape were then immediately made available to defense counsel. Minh Do renewed the motion for a mistrial on the ground of prosecutorial misconduct.

The district court, noting that the tape was useful primarily as impeachment material, denied the mistrial motion and declared a one-day recess to allow the defense attorneys to listen to the tape. Addressing Minh Do's counsel in particular, the court pointed out that Minh Do's cross-examination of Tinh Ngo had not yet begun. As it turned out, that cross-examination did not begin until five days after the tape was turned over.

██ In order to gain reversal as a result of a *Brady* violation, a defendant must show "'a reasonable probability'—one 'sufficient to undermine confidence in the outcome'—that

the jury would have resolved [the defendant's] case differently had the prosecution disclosed the [evidence] on a timely basis." *Payne v. LeFevre,* 825 F.2d 702, 707 (2d Cir.), *cert. denied,* 484 U.S. 988, 108 S.Ct. 508, 98 L.Ed.2d 506 (1987); *see also United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.); *United States v. Petrillo,* 821 F.2d 85, 89 (2d Cir.1987). We see no such reasonable probability here. Although the tape indicated that Tinh Ngo had lied to the police in his first interview, the trial court noted that

> the witness had said during his direct examination and said at least eight times during all the individual cross examinations, [that] he lied. He lied to the agents when he first met them. That was something that was right out before the jury.

(Tr. 2810.)

Thus, though we do not countenance the government's failure to fulfill its constitutional and statutory obligations to produce exculpatory or impeaching material, we cannot conclude, in light of the recess granted by the court and the redundancy of the belatedly disclosed material, that there was any prejudice. Accordingly, this failure provides no basis for reversal.

### 3. *The Knife*

During his description of the conspiracy to rob the Ming Jewelry Store in Rochester, Tinh Ngo testified that prior to going to Rochester he and Minh Do had attempted to purchase a knife in Manhattan and that when they were unable to do so, they drove to Minh Do's apartment in the Bronx to retrieve one before going to Thai's house on Long Island. On cross-examination, Minh Do's counsel extensively probed the implausibility of the story that Tinh Ngo and Minh Do had made a three-hour detour to Minh Do's apartment to get a knife rather than simply purchasing one at any hardware store.

Later in the trial, a Bureau of Alcohol, Tobacco, and Firearms ("BATF") agent who had participated in the search of the gang's vehicles in Rochester, testified that she had found a knife in one car. Minh Do immediately moved for a mistrial on the ground that the existence of the knife had neither been mentioned in any of the police reports nor disclosed by the government in response to defendants' pretrial motions.

 The district court denied the motion for a mistrial, but it gave Minh Do the options of striking the BATF agent's testimony about the knife or recalling Tinh Ngo for further examination. While arguing that neither of these remedies was sufficient, Minh Do decided not to have the testimony stricken and instead cross-examined government agents extensively about their failure to mention the knife in their incident reports. He pursues here the contention that the court should have declared a mistrial. We disagree.

Assuming that the government's nondisclosure of the seizure of a knife violated its disclosure obligations, the matter was far too insubstantial to warrant a mistrial. The cross-examination of Tinh Ngo did not intimate that there had been no knife but only that it was implausible that the gang members had taken a three-hour trip to get one from Minh Do's apartment rather than simply buying one at a hardware store. Further, the BATF agent did not testify that the knife found had belonged to Minh Do. And, as the court noted, the course of events allowed the defense to have a "field day" on cross-examination with respect to the agents' failure to mention the seized knife in their reports.

The district court offered defendants, *inter alia,* the "extreme sanction" of having the testimony stricken from the record, which is "the most severe remedy a court can impose short of declaring a mistrial." *United States v. Rodriguez,* 765 F.2d 1546, 1557 (11th Cir. 1985) (internal quotes omitted). No more was required.

### 4. *Other Claims of Prosecutorial Misconduct*

 Minh Do's other claims of prosecutorial misconduct include the claim that the government's summation improperly vouched for the credibility of its witnesses and improperly commented on the failure of the

defense to cross-examine the translator of the tape recordings. These contentions do not warrant extended discussion.

 A prosecutor may not properly vouch for the credibility of a witness. However, the government is allowed to respond to an argument that impugns its integrity or the integrity of its case, *see, e.g., United States v. Rivera,* 22 F.3d 430, 438 (2d Cir. 1994); *United States v. Bagaric,* 706 F.2d 42, 60–61 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 134, 78 L.Ed.2d 128 (1983), and "when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with 'rebutting language suitable to the occasion,'" *United States v. Praetorius,* 622 F.2d 1054, 1060–61 (2d Cir. 1979) (quoting *United States v. LaSorsa,* 480 F.2d 522, 526 (2d Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973)), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980).

Here, the integrity of the prosecutors had repeatedly been impugned. For example, Minh Do's counsel argued, "The Government wants an interpreter who will take suggestions from Tinh Ngo. The Government wants someone who will say they're willing to guess at what sounds mean and make sense out of things that they can't make sense out of, someone who will agree that if you say it in black and white on this transcript it's got to be so or at least it's possible, and they found someone who will do that." (Tr. 7273.) Lan Tran's counsel argued, "Does this case help the careers of these agents and detectives.... That's what they want, the publicity." (Tr. 7197–98.)

In response, AUSA Patricia Pileggi, in the government's rebuttal summation, made the statements challenged here:

> What do you think [AUSA] Vinegrad is interested in? Do you think that he is interested in a fabricated or a shaded version of events?
>
> Do you think that he's interested in slanting things before you?

(Tr. 7611.) In light of defendants' attacks, we conclude that this relatively mild response was not improper.

 Nor is there merit in Minh Do's challenge to the AUSA's statement that none of the defendants had cross-examined the government's translator as to the accuracy of the tapes. An observation in summation "that evidence adduced by the Government was not confronted on cross-examination is entirely proper." *United States v. Rivera,* 971 F.2d 876, 884 (2d Cir.1992) (internal quotations omitted); *see also United States v. Torres,* 901 F.2d 205, 246 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Walker,* 835 F.2d 983, 989 (2d Cir.1987). Accordingly, the government's comments were not inappropriate.

We are unpersuaded by Minh Do's additional argument that the government's comment was particularly unfair to him because one conversation with Tinh Ngo, discussed in Part II.B.1. above, had not been included in the book of final tape translations prior to trial. Minh Do apparently made no effort to have the translator recalled for cross-examination; indeed, he did not even accept the court's offer of extra time to prepare for cross-examination of Tinh Ngo on that conversation.

C. *Challenges to Identification Testimony*

 Lan Tran and Jimmy make a number of challenges to the admission at trial of pretrial or in-court identifications of them by victims of BTK's various crimes. The general principles governing these challenges are well established. A defendant has a due process right not to be the object of suggestive police identification procedures that create "'a very substantial likelihood of irreparable misidentification.'" *United States v. Concepcion,* 983 F.2d 369, 377 (2d Cir.1992) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)), *cert. denied,* —— U.S. ——, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993). The right to be free from suggestive identification procedures extends to photographic arrays. *See, e.g., Simmons v. United States,* 390 U.S. at 384, 88 S.Ct. at 971; *United States v. Concepcion,* 983 F.2d at 377; *Jarrett v. Headley,* 802 F.2d 34, 40–41 (2d Cir. 1986). An appellate court may review the

array to determine whether it was unduly suggestive. *See, e.g., United States v. Maldonado–Rivera,* 922 F.2d 934, 974 (2d Cir. 1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991); *United States v. Jacobowitz,* 877 F.2d 162, 168 (2d Cir.), *cert. denied,* 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989).

In reviewing challenges to pretrial identification procedures, a court must examine the procedures employed in light of the particular facts of the case and the totality of the surrounding circumstances. *See United States v. Concepcion,* 983 F.2d at 377; *United States v. Maldonado–Rivera,* 922 F.2d at 973. The district court's findings as to what procedures were used may be overturned only if clearly erroneous, and its assessment of the credibility of the witnesses is, as usual, entitled to deference. *See United States v. Jakobetz,* 955 F.2d 786, 803 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *United States v. DiTommaso,* 817 F.2d 201, 213 (2d Cir.1987).

If the pretrial procedures were not suggestive, any remaining questions as to reliability, such as the witness's inability to identify the same person at trial, go to the weight of the identification and not to its admissibility, and the identification therefore is generally admissible without any further reliability inquiry. *See, e.g., United States v. Maldonado–Rivera,* 922 F.2d at 974–76; *see also Jarrett v. Headley,* 802 F.2d at 42. If pretrial procedures have been unduly suggestive, an in-court identification may still be permitted if the court determines that the identification is independently reliable. *See United States v. Butler,* 970 F.2d 1017, 1021 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992). The factors to be considered in assessing reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *see also United States v. Concep-*

*cion,* 983 F.2d at 377. The factors must be evaluated in light of the totality of the circumstances, recognizing that the linchpin of admissibility is reliability. *See id.* at 378; *United States v. Butler,* 970 F.2d at 1021.

For the reasons below, we conclude that the photo array was not impermissibly suggestive and that none of the individual identifications of Jimmy or Lan Tran was the product of impermissibly suggestive procedures.

#### 1. *The Challenges to the Array*

Both Lan Tran and Jimmy contend that the array itself was unfair, principally because Lan Tran's picture was an uncropped, informal photo and because Jimmy's picture was black and white. Having examined the array, we disagree.

In evaluating whether or not a photographic array was unduly suggestive, a court must consider several factors, including the size of the array, the manner of presentation by the officers, and the contents of the array. *See United States v. Concepcion,* 983 F.2d at 377; *United States v. Maldonado–Rivera,* 922 F.2d at 974. If there is nothing inherently prejudicial about the presentation, such as use of a very small number of photographs, *see, e.g., United States v. Boston,* 508 F.2d 1171, 1177 (2d Cir.1974) (eight-photo array not impermissibly suggestive), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); *United States v. Bennett,* 409 F.2d 888, 898 (2d Cir.) (array of six not impermissibly small), *cert. denied,* 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969); *see also United States v. Marrero,* 705 F.2d 652, 655 n. 5 (2d Cir.1983) (six-photo array upheld); *United States v. Archibald,* 734 F.2d 938, 940–41 (2d Cir.1984) (same), or the utterance of suggestive comments before an identification is made, the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit,'" *Jarrett v. Headley,* 802 F.2d at 41 (quoting *United States v. Archibald,* 734 F.2d at 940).

The array used for most of the identifications in the present case contained more than 50 photographs, nearly all of which were of Asian males. All of the men pictured appeared to be of roughly the same age and had similar hair color. The photographs displayed a wide variety of hairstyles and a mixture of men with and without facial hair. Though the array consisted mostly of color "mug shots," there were several black-and-white photos, all of which were mug shots, and there were several informal color photographs, all of which were similar to each other. We conclude that the array was not unduly suggestive.

### 2. The Identification of Jimmy by Ms. Quang Nguyen

Ms. Quang Nguyen, the victim of the Asian Market robbery in Tennessee, was shown the array and initially selected one photograph that was not of Jimmy. The next day, the police substituted an uncropped color photo in place of Jimmy's black-and-white photo and presented the array to her again. After looking at the array for about 40 minutes, she selected Jimmy's picture.

■ We reject Jimmy's contention that the substitution of the color photograph of him for the original black-and-white photograph after Ms. Nguyen's initial selection of another photo was unduly suggestive. At a hearing on the admissibility of the photo identification, Ms. Nguyen stated that on the second viewing she had believed all of the pictures had been changed. She also testified, as did Detective Oldham, that no one had suggested what picture she should identify or had otherwise tried to influence her selection.

The district court was entitled to accept the testimony of Ms. Nguyen and Detective Oldham that the police did not direct her attention to any particular photograph. It was also entitled to accept Ms. Nguyen's testimony that she believed she was viewing a very different array from the first one shown her. Further, we note that since most of the pictures were in color, the substitution of one in color for Jimmy's original black-and-white photo was likely to cause the new picture of Jimmy to attract less attention, not more.

### 3. The Identification of Lan Tran by Elizabeth Lim

At the time of the robbery of San Wa Fine Jewelry in Georgia in the fall of 1990, Elizabeth Lim, daughter of the owners, was 6½ years old. She testified at trial that she had been in the store playing Nintendo when seven boys entered the store, and began to rob it. In June 1991, she was shown a photo array and was asked if she recognized any of the robbers. Elizabeth testified that she looked through the book and picked out five names. She testified that she was asked to go through the book twice more, and each time she picked out the same five photos.

Detective Oldham, who conducted the array, testified somewhat differently. He testified that he had shown Elizabeth the array and that the first time through she selected one photo, numbered 40; she then was asked to look through the array a second time and picked out photos 8, 15, and 29; she was then asked to look through the array a third time and picked photo 24, which was the picture of Lan Tran. Oldham testified that in later appearing before the grand jury, Elizabeth selected the same five photos, i.e., those numbered 8, 15, 24, 29, and 40. Both Detective Oldham and Elizabeth testified that at no time had the officers presenting the array told Elizabeth which photos to select or otherwise tried to influence her selections.

Lan Tran moved to suppress the photo identification as unreliable, on the grounds that Elizabeth was not a competent or reliable witness and that the identification resulted from a suggestive procedure. The court denied the motion. As to competence, the court stated that Elizabeth "struck me as a very intelligent child, a bright child who understood the process and knew what this was about, so I find her—to the extent that that is even an issue, I find her competent to testify." (Tr. 3251.) As to suggestiveness, the court noted first that the procedure as described by Elizabeth was unobjectionable. The court noted further that, even as described by Detective Oldham,

I still don't find that there was anything that was impermissibly suggestive about the procedure ... [because] there were a number of participants in the robbery, and there were a number of photographs, so she was called upon to look once, picked out people, asked to look again, picked out someone else and asked to look a third time.

It wasn't as if anything about this procedure narrowed her attention to the defendant [Lan] Tran himself ... [.] [I]n light of the large number of photographs, I don't think it was [an] impermissibly suggestive procedure.

(Tr. 3252–53.)

 Given the district court's unique ability to observe the witnesses, we see no basis on which to disturb either its finding that Elizabeth Lim, despite her youth, was competent to testify at trial and to attempt identification of the robbers or the conclusion that the pretrial identification procedures had not been suggestive. Although repeatedly asking a witness who has selected a certain photo to look again at the array might be troubling in some circumstances, for example if there were a small number of photos and only one perpetrator, the procedure described here, given the large number of photos in the array and the large number of robbers, was not impermissible.

 At trial, Elizabeth selected photos 15, 36, 40, and 51 from the array. The government was then permitted to introduce her grand jury testimony in which she had selected photos 8, 15, 24, 29, and 40. We reject Lan Tran's suggestion that Elizabeth's inability to select the same five photos at trial was a ground for excluding her pretrial identification. The different identification at trial goes to the weight of the evidence and is properly a basis for argument to the jury, not a ground for the exclusion of a pretrial identification that was otherwise permissible.

4. *The Identifications of Lan Tran by Bounmy Banavong and Mike Ganopoulos*

 An otherwise fair pretrial identification procedure may be rendered imper-missibly suggestive through subsequent actions or remarks by government agents. *See, e.g., United States v. Jarvis,* 560 F.2d 494, 500 (2d Cir.1977), *cert. denied,* 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978). Conduct such as showing the witness isolated pictures of the person the witness has selected, *see, e.g., Solomon v. Smith,* 645 F.2d 1179, 1185 (2d Cir.1981), or endorsing the correctness of the selection, *see, e.g., United States v. Leonardi,* 623 F.2d 746, 755 (2d Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980); *United States v. Moskowitz,* 581 F.2d 14, 20 (2d Cir.), *cert. denied,* 439 U.S. 871, 99 S.Ct. 204, 58 L.Ed.2d 184 (1978), "may tend to reinforce an otherwise weak or tentative identification and therefore lend a later in-court identification greater conviction than it deserves," *United States v. Leonardi,* 623 F.2d at 755; *see also Solomon v. Smith,* 645 F.2d at 1185. However, if the original identification was strong and unequivocal, such misguided postidentification remarks or actions will not render it invalid or preclude a subsequent in-court identification. *See United States v. Leonardi,* 623 F.2d at 755.

 Lan Tran complains here of two instances of postidentification impropriety. In connection with the investigation of the robbery of the Vientiane Restaurant in Bridgeport, Bounmy Banavong, the owner, gave the police a physical description of one of the robbers that fit Lan Tran, and she selected Lan Tran's picture from the array. Having "s[een] his whole face because he turned and spoke to me" (Tr. 4010), and having paid close attention "because somebody did something bad to me, it sticks in my eyes" (Tr. 4025), Bounmy was certain of her identification. She again selected his picture from the array just prior to testifying before the grand jury. After this second identification, a police officer showed her another mug shot of Lan Tran and said "[t]his is another photo of the same person." (January 6, 1992 Hearing at 39.) Then, before the grand jury, Bounmy selected Lan Tran's photograph from the array. She also identified Lan Tran at trial.

In the robbery of the Bangkok Health Spa in Bridgeport, one customer, Mike Ganopou-

los, had been held in the lobby of the Spa. He had not been forced to keep his head down, he had spoken several times to the robbers, and he was able to watch the robbers throughout most of the robbery. After the robbery, Ganopoulos gave the police detailed descriptions of the robbers. Before the grand jury, Ganopoulos selected the photo of Lan Tran, *inter alios,* as one of the robbers. At trial, Ganopoulos testified that several officers "told me afterwards that I had done a good job of picking them out and complimented me on my memory." (Tr. 4044.)

Though the postidentification showing of the isolated photograph to Bounmy and the complimentary remarks of the officers to Ganopoulos were inappropriate procedures, the district court found that each witness had had an adequate opportunity to view the robbers and had paid attention to the events, and it concluded that there were thus independent bases for each identification. These findings were supported by the testimony of the witnesses and are not clearly erroneous. We thus cannot conclude that the court's decision to allow the identification testimony of Bounmy and Ganopoulos, notwithstanding the flawed postidentification procedures, was error.

### 5. *Other Identifications of Lan Tran*

■ Lan Tran also makes various challenges to the identifications of him by other BTK robbery victims, including Kim Lim, who was Elizabeth Lim's mother and one of the owners of San Wa Fine Jewelry in Georgia, Jenny Ngaopraseutsck, who was present when the Vientiane Restaurant in Bridgeport was robbed, and Vinh Tran, the nephew of Sen Van Ta who was present when Ta was murdered. Lan Tran complains that Kim Lim had initially selected pictures of three other men as the robbers; that Jenny Ngaopraseutsck was present when her aunt and uncle, Bounmy Banavong and Somlith Banavong, respectively, were shown the array; and that Vinh Tran, age 13 at the time of trial, could not remember how many times he viewed the array and did not remember whether his attention had been directed toward a particular picture.

In each instance, there was testimony that the 50-photo array was presented to the witness in an entirely neutral fashion and that the attention of the witness was not directed to any particular picture. For example, as to Vinh Tran, the detective who had presented the array, testified as follows:

> We gave him the album and he flipped through the album. He looked at the album and he flipped through it and he get to photo—photograph number 24 [Tran's photo], and he look [*sic*] at the photo and then he pointed at the photo and said "this look like the guy." Then this little boy look [*sic*] at me.
>
> . . . .
>
> One of the two detectives ... told the little boy, just keep on looking, finish the book, looking through the album.

(Tr. 5052–53.) The officer then testified that Vinh Tran went through the rest of the book and did not identify anyone else. As to Kim Lim, Detective Oldham testified that Kim Lim "was asked to look through the book and identify when they [*sic*] were able to, they [*sic*] recognized who robbed the jewelry store." (December 27, 1991 Hearing at 123.) Oldham testified that he had not directed Kim Lim to any particular photograph or page, and had not said anything to her after she made her selections. In finding that the procedures leading to these identifications were not unduly suggestive, the district court clearly credited the testimony of the officers, as it was entitled to do.

As to Ngaopraseutsck, all of the witnesses testified that her attention had not been drawn to any particular photograph or page. There was evidence that she had not observed the earlier identifications made by Somlith and Bounmy; Ngaopraseutsck testified that she did not know until after she selected Lan Tran's photograph whether or not the Banavongs had identified anyone at all. The district court's finding that the procedures were not unduly suggestive is amply supported.

■ Finally, we note that Lan Tran also contends that the district court erred in allowing Vinh Tran to give "unsworn" testimony. This contention is frivolous. "When

children testify, the trial court may fashion an oath or affirmation that is meaningful to the witness." *Spigarolo v. Meachum,* 934 F.2d 19, 24 (2d Cir.1991); *see* Fed.R.Evid. 603 (setting out the oath requirement). An " '[a]ffirmation is simply a solemn undertaking to tell the truth; no special verbal formula is required.' " *Spigarolo v. Meachum,* 934 F.2d at 24 (quoting Fed.R.Evid. 603 Advisory Committee Notes).

Here, the court asked several questions to establish that Vinh Tran appreciated the difference between truth and falsehood and that he knew it would be improper to lie in this proceeding. The court concluded its questioning of Vinh Tran as follows:

> You've told me that you understand that it is very wrong to tell a lie.
>
> Do you promise me that in response to Mr. Vinegrad's questions and in response to any questions that Mr. Meyerson [defense counsel] asks, do you promise me that you will tell the truth.
>
> THE WITNESS: Yes
>
> THE COURT: You understand it's wrong not to.
>
> THE WITNESS: Yes.

(Tr. 5079.) The district court was satisfied with these answers. Nothing more was required.

D. *Challenges to the Admission of Evidence*

Defendants' evidentiary challenges include contentions (a) that the trial court improperly admitted evidence of uncharged "other crimes" in violation of Fed.R.Evid. 404(b), (b) that certain recorded statements of Son should not have been admitted as statements in furtherance of the conspiracy, and (c) that statements attributed to Sen Van Ta should have been excluded as hearsay.

1. *The So–Called "Other Crimes" Evidence*

■ Several of the defendants contend that the trial court improperly admitted evidence of uncharged "other crimes" in violation of Fed.R.Evid. 404(b), and that these rulings require reversal of their convictions. For example, Thai and LV Hong complain of the admission of evidence that they beat

Jagmohan in an attempt to get him to turn over the robbery proceeds; LV Hong complains of the admission of evidence that he attempted to extort money from Sen Van Ta and was present when Thai decided that Ta should be killed; and Jimmy complains of the admission of evidence that he participated in the robbery of Golden Star Jewelry. Each of these defendants contends that these were "other crimes" because they were not alleged against them in the indictment. These contentions are wide of the mark.

■ Rule 404(b) provides in part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). This Rule is not controlling here, for the evidence of which defendants complain was not evidence of "other" crimes. When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself. *See, e.g., United States v. Concepcion,* 983 F.2d at 392; *United States v. Angelilli,* 660 F.2d 23, 38–39 (2d Cir.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982); *United States v. Papadakis,* 510 F.2d 287, 294–95 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). "It is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy." *United States v. Bagaric,* 706 F.2d at 64. "An act that is alleged to have been done in furtherance of the alleged conspiracy ... is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *United States v. Concepcion,* 983 F.2d at 392; *see generally* 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5239, at 450 (1978).

The robbery of Golden Star Jewelry, and Jimmy's participation in that robbery, were plainly acts in furtherance of the RICO conspiracy and hence fell squarely within this principle. Thus, though his participation in that robbery was not alleged in the indictment as such an act or as a racketeering predicate act, we find no error in its admission.

The testimony of Jagmohan and Tinh Ngo as to the beating administered to Jagmohan by Thai and LV Hong because of their suspicion that Jagmohan had retained robbery proceeds instead of turning them over to Thai, similarly was not evidence of "other" crimes. Rather, it was evidence as to the existence and structure of the BTK enterprise, as to the leadership roles played by Thai and LV Hong, and as to the discipline imposed by the BTK leaders on the rank-and-file members. The rigor of the discipline was evident from the length of the beating (30 minutes) and the copious flow of blood, which, according to Detective Oldham, still stained the walls of the room several months later.

 Nor are we persuaded by defendants' related contention that the court was required under Fed.R.Evid. 403 to exclude the somewhat graphic testimony of Detective Oldham as to the bloodstains. Under that Rule, even relevant evidence may be excluded if the trial judge determines that its probative value is substantially outweighed by its potential for unfair prejudice. The court's balancing analysis under Rule 403 is reviewable under an abuse-of-discretion standard, and its resulting decision to admit or exclude evidence will not be overturned unless we conclude that the court acted arbitrarily or irrationally. *See, e.g., United States v. Tracy,* 12 F.3d 1186, 1195 (2d Cir.1993); *United States v. Jamil,* 707 F.2d 638, 642 (2d Cir. 1983).

We find no irrationality or arbitrariness here. The defense at trial was largely that the government informants, including Tinh Ngo and Jagmohan, were lying. The testimony of Detective Oldham was properly admitted to provide corroboration for the testimony of those informants. The trial court's determination that the probative value of the testimony outweighed its potential for unfair prejudice was not an abuse of discretion.

We see no greater merit in LV Hong's Rule 404(b) contentions. His participation, for example, in the attempted extortion of Sen Van Ta was one of the acts in furtherance of the RICO conspiracy; this evidence also showed LV Hong's role as supervisor of BTK's extortion activities. Further, both his

report to Thai of Ta's recalcitrance and Thai's response that Ta should be killed served to confirm Thai's role as BTK's leader.

2. *Admission of the Tape Recording Discussing the W.C. Produce Robbery and the Killing of Cuong Pham*

 One of the tapes introduced by the government reflected a conversation recorded on the eve of the trip of Tinh Ngo, Son, and other gang members to Rochester for the aborted robbery of the Ming Jewelry Store. In that conversation, Son described to Tinh Ngo the 1990 robbery of W.C. Produce and Jimmy's accidental killing of gang member Cuong Pham. Jimmy, who objected to the introduction of the tape at trial, contends that it should have been excluded as hearsay. The trial court found that it was admissible on the ground, *inter alia,* that it was a statement by Son in furtherance of the conspiracy. We find no error in that determination and need not reach the court's alternative grounds.

 Under Fed.R.Evid. 801(d)(2)(E), a statement made by a coconspirator in furtherance of the conspiracy is nonhearsay. A statement comes within this Rule if there was a conspiracy whose members included the declarant and the party against whom the statement is offered, and the statement was made during the course of and in furtherance of the conspiracy. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); *United States v. Rivera,* 22 F.3d at 435; *United States v. Tracy,* 12 F.3d at 1196. While statements that are merely "idle chatter" or that are "entirely retrospective" are not in furtherance of the conspiracy, *United States v. Lieberman,* 637 F.2d 95, 102–03 (2d Cir.1980), statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy, such as to "promote[ ] cohesiveness," *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir.), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991), or to provide reassurance to a coconspirator, *United States v. Rivera,* 22 F.3d at 436; *see also United States v. Beech–Nut Nutrition Corp.,* 871

F.2d 1181, 1199 (2d Cir.) (person to whom statements are made need not be a coconspirator so long as the statements were meant to prompt him to respond in a way that promoted or facilitated the carrying out of goals of the conspiracy), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). A finding as to whether or not a proffered statement was made in furtherance of the conspiracy should be supported by a preponderance of the evidence, and such a finding will not be overturned on appeal unless it is clearly erroneous. *See, e.g., United States v. Maldonado–Rivera*, 922 F.2d at 959. Where there are two permissible views of the evidence, the district court's choice between them cannot be deemed clearly erroneous. *See, e.g., id.*

Though Jimmy contends that Son's statement was purely retrospective and not in furtherance of the conspiracy, Tinh Ngo testified that he believed Son told him about the W.C. Produce incident "because he tried to get respect from me that he was in the gang less than me but he know more than me." (Tr. 739–40.) Tinh Ngo's testimony thus supports the inference that Son, with whom Tinh Ngo was instructed to commit a robbery, made these statements to give Tinh Ngo confidence in Son's ability to carry out their assignment. The trial court explicitly credited this testimony, and its finding that Son's statement was in furtherance of the conspiracy is not clearly erroneous. Accordingly, the tape was not excludable on hearsay grounds.

### 3. *The Posthumous Admission of the Statements of Sen Van Ta*

■ Finally, we reject Lan Tran's contention that the trial court should have excluded the testimony of New York City Police Detective Henry Murray as to statements made to him by Sen Van Ta about the extortion attempts and robbery by BTK members at Golden Star Jewelry prior to Ta's murder. Detective Murray testified that Ta told him of the receipt of the anonymous letter containing the newspaper article and broken glass, and of Thai's warning him to go to court and say that the arrested BTK members were not the men who had robbed his store. Lan Tran contends that these statements were inadmissible hearsay and that their admission violated his rights under the Confrontation Clause, thus requiring reversal of his conviction. We disagree.

■ "[I]f a witness' silence is procured by the defendant himself ... by actual violence or murder ..., the defendant cannot then assert his confrontation clause rights in order to prevent prior ... testimony of that witness from being admitted against him." *United States v. Mastrangelo*, 693 F.2d 269, 272–73 (2d Cir.1982); *see also United States v. Aguiar*, 975 F.2d 45, 47 (2d Cir.1992). In such circumstances, the defendant "will be deemed to have 'waived his sixth amendment rights and, *a fortiori*, his hearsay objection'" to the admission of the declarant's statements. *Id.* at 47 (quoting *United States v. Mastrangelo*, 693 F.2d at 272); *see also United States v. Potamitis*, 739 F.2d 784, 789 (2d Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984). Although we first articulated this rule in the context of admission of prior grand jury testimony, *see United States v. Mastrangelo*, 693 F.2d at 273, we have held that its rationale is not limited to such testimony, *see United States v. Aguiar*, 975 F.2d at 47 (complaints received by law enforcement officers admissible after defendant intimidated declarant into refusing to testify).

■ Prior to admitting such testimony, the district court must hold a hearing in which the government has the burden of proving by a preponderance of the evidence that the defendant was responsible for the witness's absence. *See United States v. Mastrangelo*, 693 F.2d at 273; *United States v. Aguiar*, 975 F.2d at 47. Further, in order to avoid the admission of "facially unreliable hearsay," the district court should undertake a balancing of probative value against prejudicial effect in accordance with Fed.R.Evid. 403. *United States v. Aguiar*, 975 F.2d at 47. The district court's findings after a hearing will not be disturbed unless they are clearly erroneous, and we are particularly hesitant to disturb the court's determinations when they are based on its evaluation of the credibility of witnesses. *See, e.g., United States v. Potamitis*, 739 F.2d at 788–89.

In the present case, the district court held such a hearing and found "by clear and convincing evidence," which as the district court recognized was a higher standard than that required, that Thai and Lan Tran "caused the unavailability of the witness [Sen Van Ta] and that he was made unavailable to prevent him from being a potential witness." (Tr. 5693.) The court also found that the statements were reliable and should not be excluded under Rule 403.

Both the finding that Thai and Lan Tran were responsible for Sen Van Ta's murder and the finding that their purpose was to prevent his testifying against BTK members were amply supported by the evidence. Kenny Vu testified that Thai ordered the murder and that Lan Tran volunteered to carry it out. Kenny Vu went with Lan Tran to Chinatown for this mission, and Eddie Tran testified that Kenny Vu told him later that day that Lan Tran had shot Sen Van Ta. The testimony of Kenny Vu and Eddie Tran, which the court expressly found to be credible, amply supported the finding that Thai and Lan Tran were responsible for Ta's murder. The court's finding of motive, *i.e.*, that "Sen Van Ta was killed for cooperating with the police ... and as a result of his value both as a witness against the Born To Kill robbers and a witness against David Thai" (Tr. 5693), was also supported. For example, Kenny Vu testified that when Thai ordered the murder, he referred to Ta as "the one who called the policemen." (Tr. 2348.) This testimony and the sequence of events amply supported the court's finding. We conclude that the court properly admitted the testimony as to Sen Van Ta's statements to the police.

E. *Quang's Challenges to His Conviction on the RICO Counts*

Quang makes two challenges to his convictions on the RICO counts. He contends that the evidence as to one of the two predicate acts attributed to him was insufficient, leaving an insufficient basis to support a RICO conviction, *see* 18 U.S.C. § 1961(5) (1988). He also contends that the court's instructions to the jury were erroneous in light of the Supreme Court's subsequent decision in

*Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) ("*Reves*"). We reject both contentions.

1. *Predicate Act Sufficiency*

Quang's sufficiency argument is that the Asian Market robbery in Tennessee was an independent venture of some of the gang members and was not sufficiently related to the affairs of BTK to constitute a predicate act by that enterprise. This contention need not detain us long.

To support a conviction under RICO, the government must establish a relationship between the predicate acts and the criminal enterprise. *See United States v. Simmons*, 923 F.2d at 951. That relationship is satisfied if the offense was related to the enterprise's activities, whether or not it was in furtherance of those activities, or if the defendant was enabled to commit the offense solely by virtue of his position in the enterprise. *See, e.g., United States v. Locascio*, 6 F.3d 924, 943 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994); *United States v. Robilotto*, 828 F.2d 940, 947–48 (2d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988); *United States v. Simmons*, 923 F.2d at 951; *United States v. LeRoy*, 687 F.2d 610, 617 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

Viewing the evidence in the light most favorable to the government, as we must in connection with any sufficiency challenge, *see* Part II.F. below, we conclude that an ample showing of relatedness was made here. Kenny Vu, who provided the bulk of the testimony of Quang's involvement in this robbery, testified that Quang proposed robbing a jewelry store that he said was run by people who were Vietnamese. He came to the Gainesville house to make his proposal where BTK members were staying, and he took BTK members with him to execute the robbery. Both the selection of an Asian target and the manner of perpetration of the robbery (*see* Part I.B.5. above) were indistinguishable from the manner of BTK's operations. And though Thai had not ordered this particular robbery, when the robbers returned with

their $66,000 in loot, they turned it over to Thai. The evidence thus was more than sufficient to support the conclusion that the Asian Market robbery was related to the affairs of the BTK enterprise.

### 2. *The Instructions*

■ In its charge to the jury, the district court instructed the jury, in part, as follows:

> The third element which the government must prove beyond a reasonable doubt is that the defendant conducted or participated, directly or indirectly, in the affairs of the enterprise. The terms "conduct" and "participate in the affairs" of an enterprise include the performance of acts, functions, or duties that are necessary or helpful to the operation of the enterprise. A person may participate in the conduct of an enterprise even though he had no part in the management or control of the enterprise and no share in any profits.

(Tr. 7743.) In *Reves,* the Supreme Court, in the context of the RICO liability of an outside accounting firm, addressed the question of "whether one must participate in the operation or management of the enterprise itself to be subject to liability under this provision." —— U.S. at ——, 113 S.Ct. at 1166.

After parsing the language of § 1962(c), the *Reves* Court concluded that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." —— U.S. at ——, 113 S.Ct. at 1170. Nonetheless, while thus adopting what it called an " 'operation or management' test," *id.,* and stating that one is liable under RICO only if he "participated in the operation or management of the enterprise itself," *id.* at ——, 113 S.Ct. at 1172, the Court also said that "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility," *id.* at ——, 113 S.Ct. at 1170, and that "liability under § 1962(c) is not limited to upper management," —— U.S. at ——, 113 S.Ct. at 1173. The Court observed that, in addition, within the meaning of § 1962(c), "[a]n enterprise is 'operated' ... also by lower-rung participants in the enterprise who are under the direction of upper management." —— U.S. at ——, 113

S.Ct. at 1173. The Court declined to "decide in [*Reves*] how far § 1962(c) extends down the ladder of operation." —— U.S. at —— n. 9, 113 S.Ct. at 1173 n. 9.

Here, Quang was proven to have participated in the conduct of BTK's affairs, for the record revealed plainly that he was not at the bottom of the management chain. Though normally Thai ordered and organized the robberies, he did not instruct Quang to rob the Asian Market in Tennessee. Rather, that robbery was solely Quang's idea, and there is no evidence that he obtained Thai's approval. Quang simply arrived at the Gainesville house and said he wanted to commit the robbery; he then took Jimmy and another BTK member with him; and the three of them carried out Quang's plan. Without deciding how far down the ladder of operation § 1962(c) extends, we have no doubt that it extends at least to Quang.

■ In any event, we note that no defendant objected to the trial court's RICO instruction in this regard, and thus we would not reverse on account of any error in light of the later-decided *Reves* unless it were plain error. *See United States v. Weiner,* 3 F.3d 17, 24 (1st Cir.1993) (reviewing § 1962(c) charge only for plain error because "*Reves* resolved a split between circuits ... so the objection could easily have been made at trial"); *see generally United States v. Tillem,* 906 F.2d 814, 825 (2d Cir.1990) (applying plain-error standard even when error in the instructions was established only by a decision rendered after the date of the trial); *United States v. Scarpa,* 913 F.2d 993, 1019–20 (2d Cir.1990) (same). Plain error is error so egregious as to result in a miscarriage of justice. *See, e.g., United States v. Tillem,* 906 F.2d at 825. If there was error in these instructions, it surely was not plain error.

### F. *Sufficiency Challenges*

■ Several of the defendants challenge the sufficiency of the evidence to support their convictions. In making such a challenge, a defendant bears a heavy burden. The appellate court must view all of the evidence, whether direct or circumstantial, in the light most favorable to the government,

*see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Gordon,* 987 F.2d 902, 906 (2d Cir.1993); *United States v. Sumnicht,* 823 F.2d 13, 15 (2d Cir.1987), and it must credit all inferences and credibility assessments that the jury might have drawn in favor of the government, *see, e.g., United States v. Matthews,* 20 F.3d at 548; *United States v. Gordon,* 987 F.2d at 906; *United States v. Stratton,* 779 F.2d 820, 828 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *United States v. LeRoy,* 687 F.2d at 616.

■■■■ We must view the pieces of evidence not in isolation but in conjunction, *see, e.g., United States v. Brown,* 776 F.2d 397, 403 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and must affirm the conviction so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt, *see United States v. Skowronski,* 968 F.2d 242, 247 (2d Cir.1992); *United States v. Sumnicht,* 823 F.2d at 15. The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Matthews,* 20 F.3d at 548; *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989).

Only Thai, challenging his conviction under 18 U.S.C. § 1959 for conspiring to bomb the Pho Bang Restaurant, has carried this burden.

### 1. *Thai's § 1959 Conviction*

■■■■ Count 15 of the indictment charged that Thai had conspired to commit assault with a dangerous weapon on individuals at the Pho Bang Restaurant "for the purpose of ... maintaining and increasing position in the BORN TO KILL, an enterprise engaged in racketeering activity," in violation of 18 U.S.C. § 1959. That section provides in pertinent part that "[w]hoever, ... for the purpose of ... maintaining or increasing posi-

tion in an enterprise engaged in racketeering activity, ... assaults with a dangerous weapon, ... or attempts or conspires so to do, shall be punished." 18 U.S.C. § 1959(a). Thai argues that there was insufficient evidence for the jury to conclude that he committed the crime "for the purpose of" maintaining or increasing his position in BTK. We agree.

■■■■ In order to establish that a crime of violence was committed "for the purpose of ... maintaining or increasing position in" a RICO enterprise, the government is required to prove, *inter alia,* that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise. *See United States v. Concepcion,* 983 F.2d at 381; *United States v. Rosa,* 11 F.3d 315, 340–41 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). Self-promotion need not have been the defendant's only, or even his primary, concern, if it was committed "as an integral aspect of membership" in the enterprise. *United States v. Concepcion,* 983 F.2d at 381 (internal quotes omitted). The motive requirement is thus satisfied if "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.*

In *Concepcion,* for example, the § 1959 defendant, a lieutenant in a narcotics enterprise, received a complaint from his workers that a competitor was trying to take over one of the defendant's retail spots, and the defendant led his associates into a gun battle against the organization's competitors. The jury in that case could properly have concluded that, as a leader of the enterprise, the defendant would have been expected to respond to reported threats to the organization's competitive position and that a failure to do so would have undermined the defendant's position and authority in his organization. *See also United States v. Rosa,* 11 F.3d at 340–41 (where § 1959 defendant joined narcotics organization as a lower-level worker, rose to become one of its leaders, and ruthlessly killed an associate in a dispute

over defendant's narcotics distribution spot, jury could properly find that the motive of the murder was the maintenance of defendant's position in organization).

In the present case, in contrast, there is no evidence from which the jury could conclude that Thai's motive for wanting to bomb the Pho Bang was other than purely mercenary. The only testimony we have seen as to why Thai wanted to bomb the Pho Bang came from the testimony of Tinh Ngo, to whom Thai gave the bomb and whom Thai instructed to get a new member of BTK to detonate it. Tinh Ngo's testimony was as follows:

Q. And did David Thai explain why he wanted you to do this?

A. Yes. I ask him why we do it for, and he said because somebody offer him big amount of money to do it.

Q. Did he say how much?

A. He said over $10,000.

Q. Did he say who or not?

A. He didn't say who.

(Tr. 1156.) When questioned as to whether he had asked Thai anything else about this event, Tinh Ngo said he asked whether Thai himself had made the bomb; but Tinh Ngo did not indicate that there had been any further questions or communications as to Thai's motive.

We do not see in this testimony any implication of a motive of the sort envisioned by § 1959. There was no evidence, for example, that the bombing was to be a response to any threat to the BTK organization or to Thai's position as BTK's leader, nor any evidence that he thought that as a leader he would be expected to bomb the restaurant. And though Thai paid the expenses of gang members, any suggestion that he undertook to bomb the Pho Bang to obtain money in order to carry out that responsibility would be entirely speculative, since the government concedes that there was no evidence as to Thai's intended use of the money.

The government's defense of the sufficiency of its evidence to support the conviction on count 15 focuses principally on the proposition that "this crime was part of BTK's criminal affairs." (Government brief on appeal at 123.) The government argues that since "[t]he gang's purpose was to earn money by committing crimes of violence against Asians" (id.), the jury could thus properly "find that this crime, *like all the others,* was intended to maintain and enhance Thai's role in the charged enterprise—the leader of a violent gang that victimized Asians for profit" (id. at 124 (emphasis added)).

Even if we agreed that this crime was "like all the others," we could hardly find that argument persuasive since, aside from the murder of Sen Van Ta, the government did not charge or prove that *any* of the others was a violation of § 1959. Indeed, the government's argument reveals too much: if it were valid, any Hobbs Act robbery or robbery conspiracy ordered by the leader of a RICO enterprise would automatically constitute a violation of § 1959.

Nor do we think the jury could reasonably have inferred from the fact that there was a prior unsuccessful attempt to bomb the Pho Bang that Thai accepted the second bombing assignment in part to maintain or increase his position in BTK. The misdirected first bombing may have been relevant to show why Thai instructed Tinh Ngo to use new recruits for the Pho Bang bombing, and it defuses Thai's argument that the Pho Bang attempt was not really BTK-related. However, there was no evidence connecting that first bombing to Thai's motivation in the second bombing. For example, there was no testimony that the unsuccessful first bombing caused any concerns among gang members about Thai's leadership. Nor was there any evidence that in light of the first bombing anyone inside or outside the gang had challenged or even questioned Thai's ability to lead. In fact, there was no evidence that prior to Thai's discussion with Tinh Ngo any BTK member other than Minh Do even knew that the wrong building had been bombed. Given the lack of evidence, we believe that any link between the initial bombing and the conclusion that Thai was motivated to accept the second bombing assignment by a desire to maintain or increase his position would have to have been based on pure speculation. While a defendant's § 1959 conviction is to be affirmed if a motivation to maintain or increase his position may be reasonably in-

ferred from the evidence, such a conviction may not be affirmed where, as here, that inference is based on no more than guesswork.

We conclude that the evidence was insufficient to support a finding that Thai conspired to bomb the Pho Bang in order to maintain or increase his position in BTK. Accordingly, his conviction on count 15 must be reversed.

### 2. The Other Sufficiency Contentions

██ The other defendants' sufficiency challenges do not warrant extended discussion. The contentions of Minh Do and LV Hong that the evidence was insufficient to establish their participation in the E5 extortions (see Part I.B.9. above) as predicate acts for the RICO counts have no merit. There was testimony that Minh Do was one of the BTK members who received discounted beeper service as a result of the gang's in-person and telephoned threats. Especially against the background of those threats, Minh Do's March 1991 visit to the store with LV Hong and Lan Tran to have their beeper service restored after E5 cut it off, stating that the two men were his "leaders" and that the beepers were for them, and his order to E5 to restore service to the beepers "and don't turn them off" (Tr. 3889), carried sufficient threatening implications to permit the jury to find Minh Do guilty of extortion.

██ Similarly, there was sufficient evidence to conclude that LV Hong was guilty of extortion with respect to the July 1991 visit with Lan Tran to E5. Though LV Hong is not reported to have spoken during that visit, the jury could easily infer, in light of what had gone before, that LV Hong was present at E5 with Lan Tran to add an implied threat of force to Lan Tran's demands, and that he thus participated in the extortion. BTK's past treatment of E5 included (a) LV Hong's request for a free beeper, which E5 denied, (b) LV Hong's suggestion that BTK rob E5 because E5 would not give him a free beeper, (c) the carrying out of that suggestion, (d) BTK's advice to E5 that the robbery had occurred because of E5's refusal to provide free equipment and services, and (e) LV Hong's suc-cessful demand for free beeper service in March 1991.

██ LV Hong's sufficiency challenge with respect to his role in the Canal Street extortions (see Part I.A. above) as a RICO predicate act is frivolous. The record included Tinh Ngo's testimony that LV Hong was in charge of collecting those payments, as well as several tape-recorded conversations confirming that testimony.

██ LV Hong's sufficiency challenge to his Hobbs Act conviction with respect to the Sun Moon Trading robbery conspiracy (see Part I.B.13. above) is no more meritorious. Both Tinh Ngo and Eddie Tran testified that Thai told them that LV Hong would be involved in the robbery. There was testimony that on the day of the robbery, Thai, Tinh Ngo, and Eddie Tran, among others, met with LV Hong; that LV Hong spoke first with Thai and Lan Tran, and then with at least one of their Italian coconspirators; and that, after the robbery plan was abandoned, Lan Tran said he "ha[d] to go somewhere to tell LV [Hong] what happened." (Tr. 1192.)

### G. Sentencing

Defendants advance a number of sentencing contentions, including challenges to the district court's sentencing procedures, its findings as to their roles in certain of their crimes, and its consideration of uncharged conduct in arriving at their respective offense levels under the federal Sentencing Guidelines ("Guidelines"). These contentions lack merit and do not require extended discussion.

██ Most of defendants' contentions are foreclosed by well-established precedents in this Circuit, to wit, that facts relating to sentencing need be proven only by a preponderance of the evidence, see, e.g., United States v. Guerra, 888 F.2d 247, 250–51 (2d Cir.1989) (defendant's relevant conduct), cert. denied, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990); United States v. Garcia, 920 F.2d 153, 156 (2d Cir.1990) (per curiam) (defendant's role in the offense); United States v. Merritt, 988 F.2d 1298, 1313 (2d Cir.) (existence of factor warranting depar-

ture from prescribed Guidelines range), *cert. denied*, —— U.S. ——, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993); that use of the preponderance standard in sentencing does not violate principles of due process, *see generally United States v. Concepcion*, 983 F.2d at 390; *United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 179–82 (2d Cir.) (use of acquitted conduct to enhance sentence does not violate due process), *cert. denied*, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Guerra*, 888 F.2d at 251; that assessments of the credibility of witnesses are within the province of the district court, *see* 18 U.S.C. § 3742(e) (1988) ("The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses."); that the sentencing court's findings of fact will not be disturbed unless clearly erroneous, *see, e.g., United States v. Beverly*, 5 F.3d 633, 642 (2d Cir. 1993); and that the district court has broad discretion in fashioning sentencing procedures, *see, e.g., United States v. Prescott*, 920 F.2d 139, 143 (2d Cir.1990) (due process does not routinely require that defendant have the right to present witnesses or receive a full-blown evidentiary hearing to resolve disputed issues).

 The only contention that warrants a modicum of discussion is the challenge of LV Hong to the court's elevation of his offense level because of his participation in crimes such as the pre-July 1991 extortions of E5 Communications, the robbery of that company, and the beating of Nigel Jagmohan, which were not alleged in the indictment as his RICO predicate acts or Hobbs Act crimes. LV Hong contends that his uncharged predicate acts would not be appropriate for grouping under Guidelines § 3D1.2(d) and thus cannot be considered as relevant conduct under Guidelines § 1B1.3. While we are somewhat skeptical of this argument, *see United States v. Carrozza*, 4 F.3d 70, 74–75 (1st Cir.1993) (relevant conduct in RICO conviction is not limited to acts in furtherance of charged predicate acts), *cert. denied*, —— U.S. ——, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994), we need not decide the issue in the circumstances of this case.

 It is true that where conduct is properly considered to be "relevant conduct" within the meaning of § 1B1.3, and hence is to be used in calculating the defendant's offense level, it is inappropriate to use it as the basis for an upward departure under § 5K2.0. *See, e.g., United States v. Coe*, 891 F.2d 405, 409–11 (2d Cir.1989). However, where such conduct is not technically relevant conduct within the meaning of § 1B1.3, it may be the basis of such a departure. *See, e.g., United States v. Kim*, 896 F.2d 678 (2d Cir.1990). In *Kim*, we held that

> with respect to acts of misconduct not resulting in conviction, the Commission intended to preclude departures for acts bearing no relationship to the offense of conviction, but to permit departures for acts that relate in some way to the offense of conviction, even though not technically covered by the definition of relevant conduct.

896 F.2d at 684.

In sentencing LV Hong, the district court stated that it would consider Hong's uncharged crimes as relevant conduct under § 1B1.3, but that if that consideration were inappropriate, the court would depart upward from the prescribed Guidelines range to reach the same sentence. The court noted that "the analysis as set forth in [*Kim*] . . . would support an upward departure under 5k2.0." (LV Hong Sentencing Hearing at 36.)

We see no error in the court's findings that the uncharged conduct at issue here related to the RICO and Hobbs Act offenses of which he was convicted. Thus, if LV Hong's uncharged acts of misconduct were not technically relevant conduct within the meaning of § 1B1.3, they formed an appropriate basis for the court's upward departure. Accordingly, given the district court's alternative bases for fixing LV Hong's offense level, we see no ground on which to disturb his sentence.

## CONCLUSION

We have considered all of defendants' contentions on these appeals, and, except to the extent indicated above, have found in them

no basis for reversal. Thai's conviction on count 15 of the indictment is reversed, and the matter is remanded for dismissal of that count and recalculation of his sentence in light of that dismissal. In all other respects, the judgments of conviction are affirmed.