MEMORANDUM AND ORDER
 

 HAIGHT, Senior District Judge:
 

 Defendants Steven Camacho, Jaime Rodriguez and Antonio Feliciano move under Rule 14, Fed.R.Crim.P., for an order severing certain counts from a superseding indictment returned on February 12, 1996: the twelfth superseding indictment in this ease. In addition, Feliciano moves to be severed from a trial of defendants Camacho and Rodriguez. The government opposes these motions.
 

 At a status conference held on March 14, 1996, counsel for all defendants stated their intention to file severance motions. The Court set down a motion schedule, with which the parties have complied.
 

 Prior to the date for submission of any motion papers, the Court entered a Memorandum and Order dated March 25, 1996, 1996 WL 137318, directing the government to furnish responses to the Court’s inquiries pertinent to the severance issue. Familiarity with that Memorandum and Order is presumed. The government has complied. It has furnished to the Court for
 
 in camera
 
 inspection all the grand jury evidence which the government contends “support[s] the connection between the Parilla murder and the C & C Organization alleged in Counts Nine and Ten of this Twelfth Superseding indictment.” Slip op. at 4. In response to that direction, the government furnished testimony of a New York City Police Departi ment detective given to the grand jury on February 7, 1996, and testimony given by an FBI agent on February 12,1996.
 

 The Memorandum of March 25, 1996 also directed the government to file and serve an affidavit “explaining its view of the manner in which the counts relating to the Parilla mur
 
 *205
 
 der” satisfy the requirements of Rule 8(b), which governs the propriety of the joinder of defendants and counts contained in the superseding indictment. The government has submitted that affidavit.
 

 Trial courts rarely grant a defendant’s application to examine grand jury testimony in advance of trial. In this case, the Court called for production of the pertinent grand jury testimony because the connection between the C & C Organization and the Nasty Boys Organization seemed tenuous. I formed that impression not only from the face of the superseding indictment, but from the encyclopedic information I acquired about the C & C Organization during the three-month trial of certain defendants under a prior superseding indictment.
 

 It is useful to preface an analysis of the governing law by summarizing the grand jury testimony furnished by the government in response to the Court’s order.
 

 I.
 

 The Grand Jury Testimony
 

 On February 7, 1996, an NYPD detective appeared before the grand jury and testified that he was participating in an investigation of the Nasty Boys organization. Following the practice of such witnesses, this officer described to the grand jury the results of his investigation, including statements made to him by witnesses. Hearsay evidence, is, of course, admissible in grand jury proceedings. The Assistant United States Attorney gave appropriate instructions to the grand jury on that point.
 

 This witness testified that on April 13, 1993, Miguel Parilla was shot to death at 360 East 137th Street in the Bronx. Parilla had a narcotics operation in the vicinity of 179th Street and Hughes Avenue, the Bronx. Par-ilia rented out his narcotics-selling location to the Nasty Boys, in exchange for heroin that the Nasty Boys would give to him. The leader of the Nasty Boys organization was Jose Muyet.
 

 Parilla annoyed the Nasty Boys by asking for increasing amounts of heroin. Muyet decided that Parilla should be killed. Louis Quinones, a member of the Nasty Boys undertook to kill Parilla, but was unsuccessful.
 

 This witness identified Steven Camacho, Jaime Rodriguez and Antonio Feliciano as “associates of the Nasty Boys hanging out with the Nasty Boys.” Tr. 12. Another member of the Nasty Boys discussed the Parilla matter with them. Muyet then instructed that individual to give a gun to Camacho, Rodriguez and Feliciano for their use in killing Parilla. That individual later saw the three defendants “at a location that the Nasty Boys were selling narcotics out of.” Tr. 14. Muyet paid the defendants for their services. Rodriguez and Feliciano were later arrested. Feliciano was in possession of a gun which ballistic tests showed to be the gun used to kill Parilla.
 

 The FBI agent who appeared before the grand jury on February 12, 1996 had participated in the investigation of the C & C Organization. He testified that James Albizu was a member of C & C. The government charges that Camacho and Rodriguez were also members of C & C, as well as associates of the Nasty Boys. The government does not charge that Feliciano had anything to do with the C & C Organization. Feliciano’s only alleged association is with the Nasty Boys.
 

 This witness testified that in early 1993, Rodriguez and Camacho assisted Albizu in killing one Hector Ocasio, also known as “Neno.” This killing was related to and in furtherance of the activities of the C & C Organization. Later in 1993, according to this witness, Rodriguez told Albizu that an individual in the Hunts Point section of the Bronx wanted to take over Miguel Parilla’s drug spot, located at 179th Street and Hughes Avenue. Albizu met with three individuals, including Muyet. Rodriguez told Albizu that “he [Rodriguez] was going to have something to do with carrying out the wishes of this gang from Hunts Point.” Tr. 10.
 

 Albizu “felt because they [Rodriguez and Camacho] had assisted him, that he should help them in their plans.” Tr. 11.
 

 On April 13, 1996, the day of Parilla’s murder, Camacho, Rodriguez and Feliciano told Albizu “what role Albizu would play in
 
 *206
 
 the murder of Parilla.” Tr. 13. Camacho and Rodriguez tricked Parilla into thinking that Albizu knew a drug supplier who would sell Parilla cocaine. Rodriguez, Camacho and Feliciano brought Parilla to the Mitchell Projects at East 137th Street, the Bronx, in the vicinity of where C & C operated. Tr. 13.
 

 Camacho and Rodriguez introduced Parilla to Albizu at the Mitchell Projects. The four men then drove to another location on Willis Avenue. Camacho and Albizu remained in the car. Rodriguez and Feliciano took Parilla into a building where Parilla was killed.
 

 II.
 

 The Governing Law
 

 Rule 14, Fed.R.Crim.P., provides in pertinent part:
 

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 

 Where as in the case at bar multiple offenses and multiple defendants are joined in one indictment, the Second Circuit “invoke[s] only Rule 8(b) to test the validity of joinder regardless of which type of severance is sought.”
 
 United States v. Turoff,
 
 853 F.2d 1037, 1043 (2d Cir.1988). Rule 8(b) provides:
 

 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 

 The consequence is that “multiple defendants may be charged and tried for multiple offenses only if the offenses are related pursuant to the test set forth in Rule 8(b), that is, only if the charged acts are part of a ‘series of acts or transactions constituting ... offenses.’ ”
 
 Turoff,
 
 853 F.2d at 1043. In support of that proposition, the Second Circuit cited and quoted a holding of the District of Columbia Circuit that the Rules of Criminal Procedure “do not permit cumulation of prejudice by charging several defendants with similar but unrelated offenses.”
 
 Cupo v. United States,
 
 359 F.2d 990, 993 (D.C.Cir. 1966) (footnote omitted),
 
 cert. denied,
 
 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967).
 

 In the case at bar, the Court required the government to submit all pertinent grand jury testimony in order to determine whether this superseding indictment is based upon evidence sufficient to show a relationship between the offenses charged sufficient to satisfy the test set forth in Rule 8(b), as interpreted by
 
 Turoff.
 
 It is immediately apparent that the superseding indictment fails that test.
 

 Focusing first upon defendant Feliciano, the government does not allege that he was a member of the C & C Organization. Feliciano is not charged as a member of the C & C RICO conspiracy, which is the only conspiracy alleged. The charges against Feliciano with respect to the Parilla murder, set forth in Counts Nine and Ten of the superseding indictment, are laid under 18 U.S.C. § 1959(a) and (a)(1). § 1959(a) prohibits the conduct charged as to Parilla if a defendant performed such acts
 

 As consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity____
 

 When one reads the indictment in the light of the pertinent grand jury testimony, it is immediately apparent that Feliciano participated in the Parilla murder to maintain or increase his position in the Nasty Boys organization. Feliciano had nothing to do with C &C.
 

 In these circumstances, many of the cases cited by the government do not relate to Feliciano. For example, while
 
 United States v. Nerlinger,
 
 862 F.2d 967, 973 (2d Cir.1988)
 
 *207
 
 articulates the rule “that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed.R.Crim.P. 8(b),” the defendants in question “were alleged to have participated in the same conspiracy,” which cannot be said of Feliciano with respect to the only conspiracy alleged in the present indictment. That also serves to distinguish
 
 United States v. Bagaric,
 
 706 F.2d 42, 69 (2d Cir.1983), where the Second Circuit said that “[v]irtually by definition, the pattern of racketeering alleged in this case constituted a ‘series of acts or transactions’ sufficiently intertwined to permit a joint trial of all defendants.” The government relies on that language; but the defendant in
 
 Bagaric
 
 who appealed from the district court’s denial of his motion for a severance, one Sudar, was charged with participating with all the other defendants in the single RICO conspiracy charged in the indictment.
 
 See
 
 706 F.2d at 52.
 

 Even where an indictment charges two conspiracies, joinder under Rule 8(b) is not proper if “the government has not alleged that the two conspiracies shared a common plan.”
 
 United States v. Giraldo,
 
 859 F.Supp. 52, 54 (E.D.N.Y.1994).
 
 See also United States v. Menashe,
 
 741 F.Supp. 1135, 1138 (S.D.N.Y.1990) (two separate conspiracies improperly joined where one of the multiple defendants was charged in both conspiracies, but no common plan between other members of the two conspiracies was alleged). In
 
 United States v. Garcia,
 
 848 F.2d 1324, 1333 (2d Cir.1988), the Second Circuit said that the government may not “arbitrarily jointly try defendants alleged to have engaged in unrelated conspiracies, for the rules governing joinder and severance still apply.”
 

 These cases apply to the case at bar
 
 a fortiori,
 
 since the only conspiracy the superseding indictment charges is that involving the C & C Organization, of which Feliciano was not a member. Instead, Feliciano is charged with substantive violations of § 1959(a).
 

 In the § 1959(a) context, the present joinder would arguably be proper if the government had available to it evidence showing that, as alleged in the superseding indictment, the defendants entered into the Parilla slaying “for the purpose of gaining entrance to and maintaining and increasing their positions in the Nasty Boys,
 
 and for
 
 the purpose of gaining entrance to and maintaining and increasing their positions in C & C.” (emphasis added). But the government’s response to the Court’s grand jury inquiry indicates that no such evidence exists. As noted, the grand jury record contains no evidence that Feliciano participated in Parilla’s murder “for the purpose of gaining entrance to or maintaining or increasing position” in the C & C Organization. Feliciano participated in the Parilla killing to maintain or increase his position in the Nasty Boys racketeering enterprise — specifically, to curry favor with Muyet, the leader of that organization, after another individual had failed to carry out Muyet’s order to kill Parilla.
 

 In
 
 United States v. Thai,
 
 29 F.3d 785, 817-19 (2d Cir.1994), the Second Circuit held that to sustain a conviction under § 1959(a), there must be sufficient evidence for the jury to conclude that the defendant committed the crime in question “for the purpose of’ maintaining or increasing his position in the designated organization. Where “there is no evidence from which the jury could conclude that Thai’s motive for wanting to bomb the Pho Bang was other than purely mercenary,” so that “the evidence was insufficient to support a finding that Thai conspired to bomb the Pho Bang in order to maintain or increase his position in BTK,” his conviction under § 1959(a) could not stand. 29 F.3d at 818-19.
 

 In the case at bar, it is apparent that the government has no evidence to show that in participating in the Parilla murder, Feliciano was motivated in any way by “the purpose of gaining entrance to or maintaining or increasing position in” the C & C Organization. Of course, Feliciano may be prosecuted for his conduct intended to advance his position in the Nasty Boys organization, but if the government has no evidence that Feliciano was also motivated by a desire to join the C & C Organization (and the government clearly has none), this indictment fails the Rule 8(b) test of proper joinder.
 

 
 *208
 
 The government fares no better with respect to Camacho and Rodriguez.
 

 Camacho and Rodriguez are charged in Counts Nine and Ten, together with Feliciano, with violating § 1959(a). As with Feliciano, they are alleged to have killed Parilla for the purpose of gaining entrance to and maintaining and increasing their positions in both the Nasty Boys and C & C. However, judging by the grand jury record, the government has no evidence that the participation of Camacho and Rodriguez in the Parilla murder was for the purpose of maintaining or increasing their position in C & C. Camacho and Rodriguez participated in the Parilla killing as associates of the Nasty Boys, and for the purpose of carrying out Muyet’s orders.
 

 The fact that Camacho and Rodriguez involved Albizu, a C & C member, in the Parilla killing does not change the § 1959(a) analysis. The grand jury testimony shows that Albizu felt that he owed Camacho and Rodriguez a favor because Camacho and Rodriguez had helped Albizu in the Ocasio killing. To be sure, the Ocasio killing was a C & C matter; but that fact has nothing to do with showing that Camacho and Rodriguez, in participating in the Parilla killing, were acting for the purpose of maintaining or increasing their position in C & C. Albizu was not a C & C leader; he was only one of many members of the C & C “security” organization, and the role he played in the Parilla killing was nothing more than returning a favor by participating in a killing entirely unrelated to C & C.
 

 Unlike Feliciano, the government alleges that Camacho and Rodriguez were members of the C & C Organization. The indictment charges the Padilla murder as the third racketeering act committed under the umbrella of the C & C racketeering enterprise. The question is whether the government has evidence available to establish the requisite relationship between the Parilla killing and the C & C criminal enterprise.
 

 In
 
 United States v. Thai,
 
 29 F.3d at 815, the Second Circuit said:
 

 To support a conviction under RICO, the government must establish a relationship between the predicate acts and the criminal enterprise. That relationship is satisfied if the offense was related to the enterprise’s activities, whether or not it was in furtherance of those activities, or if the defendant was enabled to commit the offense solely by virtue of his position in the enterprise, (internal citations omitted).
 

 The preceding discussion is sufficient to show that Camacho and Rodriguez were not enabled to participate in the Parilla murder “solely by virtue of [their] position” in C & C. They participated in the Parilla murder as associates of the Nasty Boys, being armed for that purpose by Muyet, the Nasty Boys leader. Nor can the Parilla murder be characterized as in furtherance of the C & C enterprise’s activities. C
 
 &
 
 C was in no way concerned with Parilla, whose conduct and demise arose out of the activities of an entirely different organization, operating in an entirely different section of the Bronx.
 

 So the case comes down to whether the Parilla murder was “related to [C
 
 &
 
 C’s] activities,” even if not in furtherance of them. That question must also be answered in the negative, for reasons already adequately expressed.
 

 Thai
 
 illustrates the sort of proof sufficient to show the requisite relationship between a predicate act and the alleged criminal enterprise. An organized street gang of young Vietnamese males called BTK preyed upon Asian residents. A member, one Quang, was involved in a robbery of a store run by Vietnamese. The robbery had not been ordered by Thai, the organization leader; but Quang made his robbery proposal at a house where BTK members were staying, took BTK members with him to execute the robbery, and turned the loot over to Thai when they returned. The Second Circuit concluded that “this evidence was more than sufficient to support the conclusion that the Asian Market robbery was related to the affairs of the BTK enterprise.” 29 F.3d at 815-16. There is no comparable evidence available to the government to show that the Parilla murder was related to the affairs of C & C. The other Second Circuit cases finding sufficient proof of relationship and cited by the govern
 
 *209
 
 ment are distinguishable on the same ground.
 

 The government argues in its brief that proof of “circumstances before and after” C
 
 &
 
 C murders “are imperative to a full understanding of the circumstances of the Parilla murder.” That argument is intended to bring this superseding indictment -within the holding of
 
 United States v. Turoff
 
 that joinder of two schemes is proper where “the proof of one scheme is indispensable for a full understanding of the other.” 853 F.2d at 1044. But the differences between
 
 Turoff
 
 and the case at bar are vast, as will appear from the following discussion in
 
 Turoff:
 

 Yet, there is a key link between the two offenses — one scheme stemmed from the other — and that link provides a sound basis for joinder under Rule 8(b). Appellants and their cohorts manipulated the HySn accounts simultaneously to advance the Compumeter scheme and to accumulate unreported income. The acts involved in each scheme have more than a temporal and spatial relationship.
 
 See United States v. Jackson,
 
 562 F.2d 789, 796 (D.C.Cir.1977). Significantly, the tax fraud hinged on the fraudulent activities taken to advance the Compumeter conspiracy. Consequently, the proof of one scheme is indispensable for a full understanding of the other.
 

 Id.
 

 In the instant case, the jury can fully understand the participation of Camacho and Rodriguez in the Parilla murder without any reference whatsoever to the C & C organization. On the government’s theory of the case, the leader of the Nasty Boys, Muyet, asked Camacho and Rodriguez, Nasty Boys associates, to kill Parilla, and they did so. There is no need to prove that Camacho and Rodriguez were also members of C & C, particularly where the Parilla killing did not further the activities of C & C and was unrelated to them. C & C is introduced into the Parilla murder only through the presence of Albizu, a C & C member who helped Camacho and Rodriguez kill someone because they had helped him kill someone. The government can prove Albizu’s motivation without plumbing C & C to the depths; it is even questionable whether C & C need be mentioned in making that proof.
 

 The government professes to find a “temporal and spatial relationship” between C & C and the Nasty Boys. The quoted language from
 
 Turoff
 
 indicates that temporal and spatial relationships are not sufficient by themselves to establish the linkage necessary to justify joinder. Moreover, the temporal and spatial relationships between C & C and the Nasty Boys are ephemeral. The temporal aspect is confined to the fact that Ocasio was murdered in January 1993, and Parilla was murdered in April 1993. Presumably there were a number of other murders in the City during that three-month period. As for a spatial relationship, the Nasty Boys operated in a different, non-contiguous part of the Bronx from C & C’s zone of operations. The fact that Albizu’s assisting Camacho and Rodriguez caused Parilla to be lured to C & C’s venue is fortuitous and forms no meaningful territorial relationship between the operations of the two organizations, which were entirely independent of each other.
 

 The fact of the matter is that this superseding indictment presents a quintessential example of misjoinder. It is not necessary to dwell upon the manifest prejudice to all three defendants if they go to trial on the indictment in its present form. As the District of Columbia Circuit observed in
 
 Cupo v. United States,
 
 359 F.2d at 993 (quoted by the Second Circuit in Turoff), “some prejudice almost necessarily results ... when several defendants are jointly charged with a single offense or related offenses.” Rule 8(b) permits that form of prejudice. “But the Rules do not permit cumulation of prejudice by charging several defendants with similar but unrelated offenses.”
 
 Id.
 
 That is what the government has done in the case at bar.
 

 Were this the end of the matter, I would sever the counts relating to the Parilla murder from the superseding indictments. There is no basis to sever Feliciano from Camacho and Rodriguez for trial of the Parilla charges.
 

 But there are special circumstances in this case which require a different remedy.
 

 
 *210
 
 III.
 

 The Genesis of the Superseding Indictment and the Appropriate Remedy
 

 The circumstances surrounding the filing of this superseding indictment give rise to concern.
 

 As the grand jury testimony in the instant case shows, the Nasty Boys organization came to the attention of law enforcement officials. In October 1995, a grand jury in this district returned a RICO conspiracy and substantive indictment against nine alleged members of the Nasty Boys. 95 Cr. 941 (PEL). That case is pending before Judge Leisure. Pre-trial motions are due in June 1996. Trial is scheduled for September 1996.
 

 The brief for Rodriguez on the present motion states, without subsequent contradiction by the government, that as early as September 5, 1995, the investigating officers performed ballistic tests which showed that the gun seized from Feliciano was the gun used to kill Parilla.
 

 It is also common ground that during the fall of 1995, the government and counsel for Camacho and Rodriguez were negotiating a possible disposition of the instant ease. The government offered a plea package which, as appears from the tenor of the present submissions, the government regarded as fair and reasonable. But Camacho and Rodriguez turned the offer down. At that point in the negotiations, the government mentioned to defense counsel the vulnerability of Camacho and Rodriguez to additional charges, arising not out of the C & C organization, but the Nasty Boys. The motion papers put different spins on that conversation, but its-occurrence appears to be undisputed.
 

 When Camacho and Rodriguez continued to spurn the government’s offer, the government obtained the present superseding indictment, returned by the grand jury on February 16, 1996. As noted, this twelfth superseder added the Parilla murder for the first time to the lengthy list of RICO predicate acts alleged against members of the C & C organization in the initial indictment and the first eleven superseders. It also added Feliciano for the first time as an individual having something to do with C & C. The filing of this superseder had the inevitable effect of postponing the trial of Camacho and Rodriguez.
 

 The inference clearly arising from this chronology is that the government made good on its threat to add Nasty Boys charges to the C & C indictment against Camacho and Rodriguez if those defendants did not plead to it.
 

 That inference is troublesome because the Second Circuit has cautioned that when an indictment is superseded, it must appear that “the government has not acted in bad faith or with a dilatory motive.”
 
 United States v. Kelly,
 
 45 F.3d 45, 48 (2d Cir.1995). Superseding an indictment shortly before trial, to add essentially unrelated charges to those the defendants have refused to plead to, may reasonably be regarded as bad faith.
 

 The government says in a letter dated April 9, 1996 at 2 that while it “had information showing a connection between the charged defendants and the murder of Miguel Parilla for some time,”
 
 [1]
 
 the government “was not in a position to charge the Parilla murder and related crimes until evidence was uncovered and developed after the Indictment of the Nasty Boys enterprise in late October 1995.” Accepting that representation, as I do, it fails entirely to explain why the government did not supersede the Nasty Boys indictment to add an additional Nasty Boys offense.
 

 The government argues that “because of [the] close relationship between the Ocasio/Garcia murders and the Parilla murder, much of the same evidence admissible in proving the Ocasio/Garcia murder charges would be admissible in proving the Parilla murder charges, even were the Parilla murder charges severed from the Ocasio/Garcia murder charges.” Government Brief at 8. The suggestion is that combining this proof in a single trial will conserve judicial resources by making it unnecessary to prove the C & C organization twice.
 

 
 *211
 
 There are several flaws in this argument. In the first place, the government’s reference to the Garcia murder (a C & C production) is puzzling. There is no grand jury testimony connecting the Garcia and Parilla murders. The February 12, 1996 grand jury witness testified only that Rodriguez and Camacho assisted Albizu in the Ocasio murder, which inclined Albizu to assist Rodriguez and Camacho in murdering Parilla.
 

 Second, the government does not need to prove the structure or operations of the C
 
 & G
 
 organization in any detail to establish Albizu’s motive in participating in the Parilla murder. Rodriguez and Camacho helped Albizu Mil someone. Albizu returned the favor.
 

 Third, and further on the subject of judicial resources, the government’s intended course would unquestionably require the operation and structure of the Nasty Boys organization to be proved at two trials: this one, if the superseding indictment is allowed to stand, and at the trial of the Nasty Boys indictment.
 

 In short, this is an ill-conceived and improper superseding indictment. It constitutes a misjoinder of both offenses and defendants, and its provenance suggests, to put it no higher, prosecutorial bad faith. Rule 14 gives the trial court discretion, in addition to ordering a severance, to “provide whatever other relief justice requires.” I think that the proper course in this case is to dismiss Racketeering Act Three from Count One of the indictment, and to dismiss Counts Nine and Ten in their entirety, all without prejudice. That will remove the Nasty Boys-related Parilla murder from this C & C indictment, and leave Rodriguez and Camacho to stand trial on charges related to C & C, the original provenance of the ease. There is no prejudice to the government in this, since it may indict Rodriguez, Camacho and Feliciano on the Parilla murder alone, or supersede the Nasty Boys indictment to add the Parilla charges, which is clearly what the government should have done in the first place.
 
 [2]
 

 V
 

 Conclusion
 

 The Court resolves the motions for severance by dismissing Racketeering Act Three and Counts Nine and Ten from superseding indictment S12 94 Cr. 313.
 

 The trial of Camacho and Rodriguez will begin on June 3, 1996, at 2:00 p.m. in Room 17C, 500 Pearl Street.
 

 It is SO ORDERED.
 

 SUPPLEMENTAL OPINION
 

 In a memorandum opinion and order dated May 10, 1996, familiarity with which is assumed, I resolved the defendants’ motions for severance by dismissing Racketeering Act Three and Counts Nine and Ten from superseding indictment S12 94 Cr. 313.
 

 That order had the effect of removing defendant Feliciano from the case. Defendants Camacho and Rodriguez went to trial on the remaining counts of the indictment. They were convicted on all counts following a jury trial and are awaiting sentence.
 

 Several days ago, a supervising attorney in the Criminal Division of the office of the United States Attorney for this district appeared in chambers and expressed concern about certain statements contained in the May 10,1996 opinion (the “May 10 opinion”). Those concerns were prompted by the action of the Office of Professional Responsibility, an entity of the Department of Justice, in opening an inquiry into the conduct of the prosecutors in this case. That inquiry was prompted in turn by statements of mine in the May 10 opinion.
 

 
 *212
 
 Having considered the representations made to me during that chambers discussion, and upon a reading of the May 10 opinion, I have concluded that fairness requires the filing of a supplemental opinion, for the purpose of amplifying and expanding upon certain aspects of the May 10 opinion. This is that opinion.
 

 I will deal first with a preliminary point. In its introductory paragraphs, the May 10 opinion refers to the charging instrument which provoked defendants’ severance motions as “the twelfth superseding indictment in this case.” Maj. op. at 204. Given the tenor of some of the Court’s subsequent discussion, the government reads into the quoted language a possible criticism of the number of superseding indictments. No criticism was intended. The primary reason for the number of superseding indictments was the decision of a number of defendants in this multi-defendant case to accept the government’s plea offers. Each time that happened, a new superseding indictment had to be fashioned to reflect and implement the parties’ agreement. This is, of course, standard practice.
 

 From the government’s point of view, the more problematical statements appear in Part III of the May 10 opinion, maj. op. at 210-211. In Part II I held that the government’s inclusion of the Parilla murder in the C & C indictment constituted a quintessential case of misjoinder. The government did not agree, but I had no doubt about that proposition then, and entertain none now. Part III dealt with the appropriate remedy, which, as noted, took the form of dismissing the counts relating to the Parilla murder.
 

 As I understand the supervisor who spoke to me in chambers, the government does not dispute the bare outline of the chronology recited at maj. op. at 210. There were plea negotiations between the prosecutors and counsel for Camacho and Rodriguez; the prosecutors made defense counsel aware of additional charges that might be made against the defendants, but that the government might forego if pleas were offered; defendants rejected the plea offers; and the government superseded the indictment to include charges arising from an additional incident, namely, the Parilla murder.
 

 Having recited that chronology, I went on to say that this chronology gave rise to an inference “that the government made good on its threat to add Nasty Boys charges to the C & C indictment against Camacho and Rodriguez if those defendants did not plead to it,” a “troublesome” inference because “[superseding an indictment shortly before trial, to add essentially unrelated charges to those the defendants have refused to plead to, may reasonably be regarded as bad faith,” maj. op. at 210. This was, I wrote, a “provenance [that] suggests, to put it no higher, prosecutorial bad faith.”
 
 Id.
 
 at 211.
 

 It is now said, on behalf of the prosecutors who had the case in charge, that an expressed willingness to forego additional charges if a plea is agreed, followed by the assertion of such charges if plea negotiations fail, frequently if not routinely plays a part in this sort of negotiation. That practice, the government submits, negates any inference of bad faith.
 

 I think there is force to this submission. It is inherently plausible. I cheerfully confess that I have no personal experience to cast it into question, never having served as a prosecutor or criminal defense counsel before coming to the Court. I also take into account the high reputation for probity enjoyed by the office of the United States Attorney for this district.
 

 While the May 10 opinion stopped short of making a finding of prosecutorial bad faith, it stopped just short of it. I am no longer satisfied with the quoted language. My purposes in this supplemental opinion are to make it clear that I did not make a finding of bad faith, and am no longer prepared to say that the chronology of events gives rise to that inference.
 

 Having said this, I think it right to add that it does not, in my view, affect the appropriateness of the resolution of the case. Camacho and Rodriguez received a more fair trial on the C & C charges than they would have if it had been complicated by the presence of Feliciano and a Nasty Boys-oriented charge; and judicial resources will be con
 
 *213
 
 served by the government’s subsequent decision to supersede the Parilla murder into the pending main Nasty Boys case, a course which I said in the May 10 opinion at maj. op. at 211 was “clearly what the government should have done in the first place.”
 

 It is SO ORDERED.
 

 Dated: Sept. 10, 1996
 

 [1]
 

 . Since the government knew by September 5, 1995 that a gun seized from Feliciano was the Parilla murder weapon, this seems to be something of an understatement.
 

 [2]
 

 . All defendants argue in the alternative that the superseding indictment is barred by the law of the case doctrine. That argument is based on the Court's oral direction, at a hearing on October 3, 1994, which barred further superseding indictments.
 

 The government professes, in its April 9, 1996 letter, that it "does not take lightly the Court’s concerns amount the management of its docket.” Given the timing of the present superseder, that reassurance rings hollow. But I agree with the government that the circumstances in October 1994 were quite different, and accordingly decline to apply the law of the case doctrine.